627 So.2d 815 (1993)
John Daniel STOGNER
v.
STATE of Mississippi.
No. 90-KA-610.
Supreme Court of Mississippi.
December 2, 1993.
James G. Tucker, III, Bay St. Louis, for appellant.
Michael C. Moore, Atty. Gen., Ellen Y. Dale, Sp. Ass't. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE and PRATHER, P.JJ., and PITTMAN, J.
PITTMAN, Justice, for the Court:
John Daniel Stogner was convicted of aggravated assault and sentenced to serve twenty (20) years in the Mississippi Department of Corrections for the shotgun shooting of Flem Harrison. Stogner filed an appeal and raised several assignments of error. Finding no reversible error, this Court affirms.

I.
On December 5, 1987, Flem Harrison was found lying in a pool of blood in the living room of his home. Harrison had suffered shotgun wounds to his face. Stogner, Harrison's roommate, claimed that he found Harrison lying on the floor when he arrived home *817 that evening. He asked neighbors to call an ambulance. When the police arrived, Stogner was found crouched behind a tree in the front yard complaining he was "sick to his stomach." Stogner and Harrison were friends and had resided together for several years.
Investigation revealed shots had been fired from a shotgun based on blood splatters and pellets embedded in the wall. One spent shell was found in the living room and a second in the backyard. The shotgun, a single shot .20 gauge, was found on the back porch. The glass in the kitchen window had been broken. There was a light spray of blood on Stogner's clothes and his blood covered jacket was found under a pile of clothes in his bedroom.
Stogner first told officers he had been driving around Gulfport Harbor while waiting for Harrison to come home so they could go out for drinks. When he returned home, he saw Harrison's car in the driveway, and when he went inside he found Harrison shot and bleeding. He briefly held Harrison in his arms and then, in an emotional state, picked up the shotgun, threw it and kicked an empty shell outside. Stogner thought Harrison had walked in on a burglary and had been shot by the burglar.
Later, Stogner changed his story and said he arrived home before Harrison. He walked to and around the harbor, and upon his return home, Harrison's car was parked in the driveway and he found Harrison inside the house lying in a pool of blood.
At the hospital, Dr. Sproles, the treating physician, found that half of Harrison's face and his collar bone had been blown away by the shotgun blast. Dr. Sproles concluded that Harrison had attempted suicide and questioned the victim about the suicide attempt. At trial, Dr. Sproles testified that in his opinion the shotgun was in or very close to Harrison's mouth when fired. The shot was fired at a downward angle from above Harrison. Harrison required several surgeries during his lengthy hospitalization.
On December 10, 1987, Detective Butch DiSalvo questioned Harrison in the hospital, and although Harrison could not talk, he was able to respond to DiSalvo's questions by writing the answers down on a piece of paper. At trial, Harrison testified that as he walked into the unlit house, he saw Stogner who shot him twice, once in the face and once in the shoulder. It was revealed, however, that Harrison was suffering from memory loss resulting from an operation on February 2, 1989. Following the operation, Harrison was left without oxygen for over an hour and suffered some brain damage resulting in memory loss. Cross-examination revealed Harrison's memory loss. Stogner argues that without the memory loss, Harrison would not have named Stogner as his assailant and would have admitted that he attempted suicide which was corroborated by the testimony of Dr. Sproles.
Stogner called no witnesses and elected not to testify. The jury found Stogner guilty of aggravated assault, and he was sentenced to serve twenty (20) years in the Mississippi Department of Corrections. Feeling aggrieved, Stogner filed this appeal assigning the following errors:
I. Stogner was denied his constitutional right of speedy trial.
II. The trial court erred in allowing the State to prove that, upon being read his Miranda warnings, Stogner answered no questions and fainted.
III. The lower court erred by allowing the State's witness, Detective Butch DiSalvo, to give expert opinions.
IV. The verdict was against the overwhelming weight and sufficiency of the evidence.

II.
Stogner claimed that he was denied his constitutional right to a speedy trial. He was arrested on December 10, 1987, but not tried until January 23, 1990, a delay of over twenty-five months. The appropriate test of a denial of the defendant's fundamental right to a speedy trial is set out in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The 270 day rule does not apply because Stogner was tried within 270 days from the date of his arraignment. Handley v. State, 574 So.2d 671, 674 (Miss. *818 1990); Miss. Code Ann. § 99-17-1 (Supp. 1992).
In Barker, the Supreme Court listed four factors to be considered in determining whether or not the accused had been denied a speedy trial. These factors are weighed and balanced in each case according to the facts. "The weight given each necessarily turns on the peculiar facts and circumstances of each case, the quality of evidence available on each factor and, in the absence of evidence, identification of the party with the risk of non-persuasion. No one factor is dispositive." Jaco v. State, 574 So.2d 625, 630 (Miss. 1990). The four factors are analyzed as follows:

A. Length of Delay.
The right to a speedy trial attaches at the time of arrest. Smith v. State, 550 So.2d 406, 408 (Miss. 1989). Stogner was arrested on December 10, 1987, and he was not tried until January 23, 1990. This delay of approximately twenty-five months raises a presumption of prejudice. See Smith, 550 So.2d at 408 (generally a delay of eight months is presumptively prejudicial). "This factor, alone, is insufficient for reversal, but requires a close examination of the remaining factors." Handley, 574 So.2d at 676. This factor favors Stogner.

B. Reason for the Delay.
In addressing the reason for delay, the Court must consider the particular facts of the case. Stogner was arrested on December 10, 1987. He was indicted on May 12, 1989, seventeen months after his arrest, and arraigned on June 5, 1989. The initial trial was set for August of 1989, but on August 16, 1989, Stogner requested a continuance at a pre-trial hearing. The trial court determined that all delay after August, 1989, was charged to the defendant based upon his motion for continuance. "[I]f the defendant caused the delay, he will not be allowed to complain." Perry v. State, 419 So.2d 194, 199 (Miss. 1982). Thus, the Court must analyze the reasons for the twenty month delay from December 10, 1987, to August 16, 1989.
At the pre-trial hearing on August 16, 1989, the State presented testimony that Harrison had to undergo several surgical treatments and that it was several months before he could verbally communicate.
In Harrison County, the grand jury is scheduled to meet in March and September of every year. The State maintained that Stogner's case could not have gone to the grand jury in March of 1988, because Harrison was not able to verbally communicate. Detective DiSalvo conducted an interview with Harrison in July 1988. It was determined that Harrison had sufficiently recovered so that the State could go forward with the case. The police department began to review the file in August 7, 1988. The file did not reach the district attorney's office before the next grand jury was convened in September of 1988. In March of 1989, the grand jury convened, but it was adjourned without handing down any indictments due to the resignation of District Attorney Glenn Cannon. When the new district attorney took office, the police department handed the district attorney over 400 cases. The grand jury was reconvened in April of 1989, and Stogner's case was presented on April 14, 1989. An indictment was handed down on May 12, 1989. Stogner was arraigned on June 5, 1989, and his trial was set for August of 1989.
The State blamed part of the delay on an overcrowded docket. In Barker, the United States Supreme Court addressed the issue of overcrowded dockets:
Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.

Id. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117.
*819 Although this factor must be weighed against the State, it should not be weighed too heavily against the State due to the fact that Harrison was not physically able or ready to proceed with the case until July of 1988, allowing only two months to prepare for the next grand jury in September of 1988. Stogner's case was presented at the next available grand jury in March of 1989.

C. Assertion of Right.
Stogner did not raise the speedy trial issue until August, 16, 1989.
The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.
Barker, 407 U.S. at 531-32, 92 S.Ct. at 2192-93, 33 L.Ed.2d at 117-18. "Of course, an accused has no duty to bring himself to trial... . Still he gains far more points under this prong of the Barker test where he has demanded a speedy trial." Jaco, 574 So.2d at 632 (citations omitted). This factor favors the State.

D. Prejudice.
Stogner raised several different theories of prejudice: (1) the delay had an effect upon the memory of defense witnesses; (2) he had to live with the anxiety and stigma of being charged with a crime; (3) Harrison suffered a diminished memory and if he had possessed total memory, he would have remembered that he shot himself in an attempted suicide; and (4) as a result of the delay, he was unable to locate a witness that could testify as to what time he left Gulfport Harbor the evening of the shooting.
Stogner, however, called no witnesses, rendering his first claim moot. Furthermore, he was out on bail two or three days after his arrest. He was not even indicted during the majority of the delay. Finally, the only witness that Stogner claims he could not locate was a man known only as "Paul" who was allegedly at Gulfport Harbor on the evening in question. The only other information known about Paul is that he was in a vehicle with Pearl River County plates. Stogner admitted that the only effort he had made in locating Paul was to drive down to Gulfport Harbor and look for him there.
Stogner failed to prove that he was prejudiced. There is no evidence that even if the State had proceeded to trial shortly after the shooting that Stogner would have been able to locate Paul. This factor favors the State.
Considering the totality of the circumstances in light of the Barker factors examined above, this Court finds that Stogner was not denied his constitutional right to a speedy trial. Although the delay was presumptively prejudicial and the reason for the delay weighs against the State, although not heavily, Stogner failed to assert his right to a speedy trial until August 16, 1989, and he failed to show any material prejudice.

III.
Stogner claimed Detective DiSalvo's testimony, concerning the fact that he fainted after he was informed of his Miranda rights, created an unfavorable inference of guilt and was a violation of his constitutional rights. On direct examination, Detective DiSalvo testified as follows:
Q. Okay. Now, do you recall finally reaching the stage where you concluded that the Defendant Stogner was a suspect and you placed him under arrest and gave him his constitutional warnings?
MR. McGUIRE: To which we object.
THE COURT: Overruled.
Q. Do you recall that?
A. Yes, sir.
Q. What did he do?
A. You're referring to when he fainted?
Q. Yes, sir.
A. He wasn't placed under arrest. I just advised him of his rights.
Q. What did you tell him? Let's tell the jury what you told him and then tell the jury what he did.

*820 MR. McGUIRE: I'm going to interpose an objection.
MR. DeMETZ: Your Honor please, he's now reached the suspect stage 
THE COURT: Come here. I think I know what he's objecting to.
.....
Q. Rephrasing, getting you where we were, I asked you [sic] he had reached suspect stage, you advised him of his constitutional rights; is that correct?
A. Yes, sir.
Q. That's what we call the Miranda warnings?
A. Correct.
Q. That's the one everyone's heard on TV, you have a right to a lawyer, blah, blah, blah?
A. Yes, sir.
MR. McGUIRE: For the record, we interpose an objection.
THE COURT: Noted and overruled.
Q. What the [sic] did the Defendant Stogner do or say at the moment you advised him of his rights?
A. He fainted.
Q. What did he then do?
A. We revived him and 
THE COURT: Wait a minute. Counsel, given what we said here you better approach this witness. There's a need for that.
MR. DeMETZ: Your Honor please, I'll withdraw that question.
In Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court held:
[W]hile it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. Mr. Justice White, concurring in the judgment in United States v. Hale, [422 U.S. 171] at 182-83, 95 S.Ct. 2133 [at 2139-40], 45 L.Ed.2d 99, put it very well:
"[W]hen a person under arrest is informed, as Miranda requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony... . Surely Hale was not informed here that his silence, as well as his words, could be used against him at trial. Indeed, anyone would reasonably conclude from Miranda warnings that this would not be the case."
Doyle, 426 U.S. at 618-19, 96 S.Ct. at 2245, 49 L.Ed.2d at 98 (footnotes omitted).
Fainting, however, is not the same as saying Stogner refused to testify. Stogner did not give a statement and Detective DiSalvo did not comment on his silence. There is no merit to this issue.

IV.
Stogner also contended that the lower court erred by allowing Detective DiSalvo to give expert opinions. Detective DiSalvo testified that he checked the house and determined that there were no signs of burglary. He pointed to the fact that dust remained on the broken windowsill and that Christmas presents from inside had been placed on the back porch, "as if an individual were trying to set up a burglary." The defendant's objection was sustained to this conclusion, and the witness was admonished to refrain from giving conclusions. Later in his testimony, DiSalvo stated he had satisfied himself that there had not been a burglary.
DiSalvo did exceed limitations when he concluded someone had tried to create the appearance that the house had been burglarized. Jackson v. State, 551 So.2d 132, 142 (Miss. 1989). The physical facts, however, raise serious questions to Stogner's theory *821 that Harrison had been shot by a burglar. When reviewed with the substantial evidence of Stogner's guilt, such error is harmless. See Jackson, 551 So.2d at 142; Whittington v. State, 523 So.2d 966, 974-75 (Miss. 1988).
DiSalvo's remaining testimony, claimed as prejudicial, is not subject to appellate review because Stogner failed to make timely objections. M.R.E. 103(a)(1); Lambert v. State, 574 So.2d 573, 575 (Miss. 1990). There is no merit to this issue.

V.
The remaining issues raised by Stogner on appeal are devoid of merit and do not warrant discussion. Stogner's conviction is affirmed.
CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.
HAWKINS, C.J., PRATHER, P.J., and BANKS, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
McRAE, J., dissents with separate written opinion joined by DAN M. LEE, P.J., and SULLIVAN, J.
McRAE, Justice, dissenting:
Stogner raises four issues on appeal. First, he contends that allowing Detective DiSalvo, the chief investigator, to give conclusions and expert opinions stating Stogner's statements were incorrect and that he apparently attempted to feign a burglary, was erroneous. The State even admitted that it was error for him to give these conclusions by stating:
As to this particular instance, we concede that DiSalvo briefly transgressed the bounds of permissible lay opinion testimony provided for by Mississippi Rule of Evidence 701 by stating that there seemed to be an attempt to feign a burglary. We contend, however, that it was nevertheless harmless error based on this Court's opinion in Jackson v. State, 551 So.2d 132 (Miss. 1989).
By so testifying, he also was allowed to express an opinion that two shots were fired, indicating that Stogner was guilty of feigning a burglary. Under Roberson v. State, 569 So.2d 691 (Miss. 1990), his opinion should not have been allowed, as the State's admission indicates.
This error, coupled with the allowance of a comment by the arresting officer, over objection, that the defendant fainted and refused to answer any questions when read his Miranda rights, indicates that the State was allowed to inject a comment upon an implication of his guilt, which obviously led the jury to believe the defendant was guilty. Standing from a distance and reviewing the record, it cannot be said that the defendant received a fair trial. I therefore dissent.
The more serious issue of a speedy trial requires this case to be reversed and rendered. The majority correctly states that the right to a speedy trial attaches at the time the State arrests the defendant, citing Smith v. State, 550 So.2d 406, 408 (Miss. 1989). The right to a speedy trial is guaranteed by the United States Constitution as well as section 26 of the Mississippi Constitution. There was a delay of at least twenty months of chargeable time from the day of Stogner's arrest until he was tried. His constitutional rights to a speedy trial were clearly violated. The majority admits that this delay was unusually long and clearly prejudicial, but gives no credence to it. The majority excuses the delay by arguing that the Harrison County Grand Jury schedules only two meetings per year and further, that the case could not have gone before the grand jury in March 1988, because the victim, Harrison, could not communicate verbally at that time.
A review of the facts shows that Harrison was hospitalized until April, 1988. Later, in July, Harrison told Detective DiSalvo that he did not want to prosecute. Sometime later, when requesting a preliminary hearing, DiSalvo told the defense attorney that Stogner would never be indicted. Apparently, the defense relied on this statement. Officer DiSalvo testified that when he talked to Harrison in the hospital, he was not sure at that time if Harrison wished to go through with *822 the prosecution. This statement would appear to refute the majority's statement that Harrison was unable to communicate. While it is true that Harrison suffered from long and short-term memory loss as a result of an incident which occurred in the hospital, he was still able to communicate. This incident favors the State. When Harrison testified two years later that he was unclear about what happened, the trial judge remarked outside presence of jury:
[T]his witness's testimony appears to me to come and go, that is his memory comes and goes, and obviously he's testified and sworn to his ability to identify this defendant today whereas he said explicitly he could not swear to that today.
After a two-year delay where the only eyewitness was the victim who suffered from serious memory problems, the jury weighed the evidence in favor of the victim and not the defendant. The delay clearly went to the State's benefit and was prejudicial to Stogner.
In July, 1988, two months after leaving the hospital, Harrison expressed a desire to proceed with the case. For no apparent reason other than mere negligence on the part of the State, the case file remained with the police department until February, 1989, when it was given to the district attorney. Clearly, this goes against the State heavily. This case was prosecuted in the name of the State of Mississippi and not in the name of Harrison. It is irrelevant that Harrison decided he wanted to prosecute the case. The State, rather than Harrison, charged and arrested Stogner, thus starting the time clock running against the State.
The argument that some delay may be excused by the court schedule, likewise, is not compelling. The majority fails to mention that Harrison County is no different from any other county in Mississippi. A grand jury can be convened at any time. Even so, the next regular session was in September, two months after Harrison stated he wanted the case to go forward. The case was not presented to that grand jury and no excuse was given except that the file remained in the police department and was not turned over to the district attorney until February, 1989. Stogner lost the benefit of a preliminary hearing, as well as further investigation to find an alleged witness, by relying on the statement to his defense counsel by Detective DiSalvo that the case would never go to the grand jury. Further, the State gained the advantage when the victim suffered a memory loss on cross-examination. The jury could relate to Harrison due to the fact that over two years had elapsed and he had suffered a brain injury and memory loss.
Stogner was clearly prejudiced by the long delay. Recently in Doggett v. United States, ___ U.S. ___, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), the United States Supreme Court, holding that prejudice is now to be presumed where protracted delays are attributable to the government, stated:
As an alternative to limiting Barker, the Government claims Doggett has failed to make any affirmative showing that the delay weakened his ability to raise specific defenses, elicit specific testimony, or produce specific items of evidence. Though Doggett did indeed come up short in this respect, the Government's argument takes it only so far: consideration of prejudice is not limited to the specifically demonstrable, and, as it concedes, affirmative proof of particularized prejudice is not essential to every speedy trial claim... . Barker explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony "can rarely be shown." ... And though time can tilt the case against either side, ... one cannot generally be sure which of them it has prejudiced more severely. Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other Barker criteria, ... it is part of the mix of relevant facts, and its importance increases with the length of delay.
* * * * * *

*823 Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground. While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him. It was on this point that the Court of Appeals erred, and on the facts before us, it was reversible error.

Barker made it clear that "different weights [are to be] assigned to different reasons" for delay. Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun. And such is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness, ... and its consequent threat to the fairness of the accused's trial. Condoning prolonged and unjustifiable delays in prosecution would both penalize many defendants for the state's fault and simply encourage the government to gamble with the interests of criminal suspects assigned a low prosecutorial priority... .
... When the Government's negligence thus causes delay six times as long as that generally sufficient to trigger judicial review, ... and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence, ... nor persuasively rebutted, the defendant is entitled to relief.
Doggett v. United States, ___ U.S. ___, ___-___, ___, 112 S.Ct. 2686, 2692-93, 2694, 120 L.Ed.2d 520, 530-31, 532 (1992) (citations omitted).
The majority excuses the State, even though it arrested the defendant, for not indicting him. Had he been indicted in March, 1988, the 270-day rule would have been applicable. Prejudice would have been presumed after 270 days. It can only serve to the State's advantage to wait a year after arrest to bring an indictment. Our commitment to the right of a speedy trial goes back to the to the mid-19th century. In Nixon v. State, 2 Smedes & M. (10 Miss.) 497, 41 Am.Dec. 601 (1844), we laid down the definition of a speedy trial, as a "trial conducted according to fixed rules, regulations, and proceedings of law, free from vexatious, capricious and oppressive delays, manufactured by the ministers of justice." Id. at 507. In 1964, we reiterated this principle in Jones v. State, 250 Miss. 186, 164 So.2d 799 (1964). The United States Constitution, as well as § 26, Miss. Const. 1890, demand the protection of a right to a speedy trial begins when one is arrested. Because the majority is paying lip service to our constitution, I dissent.
DAN M. LEE, P.J., and SULLIVAN, J., join this opinion.