722 A.2d 52

Sean X. DUPREE

v.

STATE of Maryland.

No. 21, Sept. Term, 1998.

Court of Appeals of Maryland.

Dec. 23, 1998.

Nancy S. Forster, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for Petitioner.

Emmet Davitt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

RAKER, Judge.

In this case Petitioner was convicted by a jury in the Circuit Court for Baltimore City of second degree murder and use of a handgun in the commission of a crime of violence. During his direct testimony, the investigating detective was permitted to testify, over defense counsel's repeated objections, that after Petitioner was arrested, the detective advised him of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), even though Petitioner had made no subsequent statement to the police. The Court of Special Appeals affirmed Petitioner's convictions in an unreported opinion. We granted Petitioner a writ of certiorari to answer the question, "If the defendant chose to remain silent when questioned by the police after his arrest, may the State elicit testimony that the police read the defendant his *Miranda* rights?" Our answer is in the negative. Because we conclude that the disputed testimony bore no relevance to any issue in the case and was highly prejudicial, we shall reverse.

## I.

On May 3, 1996 Hulbert Clark was returning from a local store with three friends after an afternoon of playing basketball in the neighborhood park. While walking eastbound along the 4000 block of Chesterfield Avenue in Baltimore City between six o'clock and six-thirty in the evening, Clark and his companions, Dwayne Green, William Roberts and Antoine Williams, were approached by Petitioner, Sean Dupree. Dupree exchanged greetings with the group and at some point shortly thereafter, according to Green, became engaged in "loud talking" with Clark.

Green testified that after a mutual exchange of "What's up?" with Dupree, his attention had been momentarily diverted from his friends but was drawn back by a "commotion" between Dupree and Clark. While unable to distinguish all that the two were saying, Green recalled that Dupree was saying "What's up, what's up" in a "tone of voice [that] didn't sound like a regular greeting." As Green turned back to-

wards this commotion, he observed Dupree holding Clark in his chest area and pointing a handgun at Clark's head. Dupree pulled the trigger and shot Clark in the head. Green stated that Dupree shot Clark another two times, once as the victim was falling and again as his body hit the ground. The shooting took place less than two feet in front of Green. As Dupree turned toward Green, the latter fled to an alleyway where he remained momentarily until he was certain Dupree had left the area. Green then returned to the scene of the shooting. After seeing Clark's lifeless body and Antoine Williams kneeling down nearby in what appeared to be a state of prayer, Green ran to his house nearby "to dial 911." Green testified that at no point did he ever see Clark with a gun. Moreover, he reasoned that neither Clark's attire of sweatpants and a tee-shirt, which he had just put back over his torso only moments before the shooting, nor Clark's activity of playing basketball all afternoon would have been suitable to carrying a gun.

In his testimony, William Roberts reiterated Green's account of their returning from the local store along with Clark and Antoine Williams when Dupree approached and joined the group. Roberts further testified that he and Williams were walking ahead of the other three, with Dupree and Clark following together in the middle and Green trailing along directly behind them, when he heard three gunshots. He turned to see what had happened and observed Clark lying on the ground and Dupree running towards a nearby alley. Roberts then ran to Green's house and called Clark's mother to inform her that her son had just been shot. Roberts acknowledged on cross-examination that Dupree and Clark had been speaking to each other before the gunshots occurred but he was unable to distinguish what the two were saying. In addition, Roberts confirmed that he too had witnessed Williams kneeling down in prayer over Clark's body. Because he could not be located, Antoine Williams did not testify.

Detective Richard Petrey testified that, as the primary detective assigned to investigate the shooting death of Hulbert Clark, he responded to the scene within minutes and shortly

received from a fellow officer the name of Sean Dupree as a suspect. Unable to locate Dupree at his home, the detective obtained a warrant for Dupree's arrest. On May 31, 1996 Detective Petrey had Dupree profiled on local television news programs as being wanted for murder. The next day Dupree turned himself in to the police. During Detective Petrey's direct testimony regarding his post-arrest interview of Dupree, the following occurred:

Q. And, upon meeting the Defendant what, if anything, was done by you at the time?

A. Okay. There is a—

[DEFENSE COUNSEL]: I object.

THE COURT: Come on up.

During the ensuing bench conference, the following exchange took place:

[DEFENSE COUNSEL]: He continues his constitutional right to remain silent, which just the fact that he didn't say anything is not incriminating. So, he has a constitutional right not to say anything, so I object to any line of questioning whether he said anything or didn't say anything. The truth is he didn't say anything as the State related to us.

[PROSECUTOR]: His rights were enforced.

[DEFENSE COUNSEL]: I understand.

[PROSECUTOR]: All I want to do is ask him is did he explain his rights to him, did he understand them, did he proceed to make a statement.

[DEFENSE COUNSEL]: I submit he has a constitutional right to remain silent.

[PROSECUTOR]: That's exactly what he's going to say. He didn't say anything.

[DEFENSE COUNSEL]: Then why is it being brought up? There is no statement that is coming in. There—it will only leave an impression with the jury that there is something wrong with him not saying something.

THE COURT: Well, you can ask him did he ask—did he advise him of his rights according to procedure and then stop.

[PROSECUTOR]: Okay.

THE COURT: He's right.

[PROSECUTOR]: Okay.

The assistant state's attorney then continued the direct examination of Detective Petrey:

Q. Detective Petrey, upon your first meeting with the Defendant did you advise him of his rights according to Police Department procedure?

A. Yes, I did.

Q. Would you advise the jury what you advised the Defendant of with regard to his rights?

A. Okay.

[DEFENSE COUNSEL]: Objection.

THE COURT: Go ahead, sir.

THE WITNESS: There is a Police Department form that we use. It's form, Form 69, that we use with everybody who is taken into custody and on this form their name appears, age, their educational level, their date—I'm sorry—the date and the time is put on to the form also. In addition to the form in the upper right hand corner I noted certain things about the Defendant such as he was left handed, that he did not require glasses, that he had no drugs or alcohol, he was on no medication, and that he could read or write.

BY [THE PROSECUTOR]:

Q. Now, when you advised him of his rights was there anyone else with you at the time other than the Defendant?

A. Yeah, that would have been Detective Hoover.

Q. And, upon advising the Defendant of his rights did you get the understanding that he understood what he was being advised of?

A. Yes, after each of the rights, number one through five, there is a small line at the rear of each right where the

Defendant initials and that indicates that he does understand his rights.

During cross-examination of the detective, defense counsel pressed the point that the scene of the shooting had not been secured for a number of minutes before the first police officer arrived and therefore the area around Clark's body was subject to possible "tampering." In addition, the defense elicited from Detective Petrey that the police had not been able to locate Antoine Williams, the third eyewitness to the shooting (and the last person known to be near Clark's body before police arrived), since the summer of 1996, some nine months prior to the trial.

Dupree took the stand in his own defense and testified that he ran into the group while he was walking down the street. Dupree explained what transpired thereafter:

I spoke to them. They said what's up. I said nothing. That's when [Clark] turned, said bitch, you run up on me like that again I kill you. I said what? He said you heard me, nigger. What's up? So, he shoved his hand down his pants like so. He put his hands down, so he shoves his hand down his pants like he was going for his gun, so I grabbed mine and shot.

Dupree testified that it was this gesture by Clark and his seeing the butt of a black gun that caused him to react in panic by shooting Clark aimlessly with his own "22" that he had bought "off the street." After shooting Clark, Dupree dropped his own gun and ran. Dupree further related that all he knew about Clark was that he was from Atlanta and that because they "didn't have a relationship" Dupree "didn't know how to take him." Clark had made threats to Dupree in the past, "[l]ike nigger, you don't know where I'm from. You don't know." Hence, he took Clark's threatening gesture seriously and "reacted accordingly."

During portions of his closing argument the prosecutor addressed the jury as follows:

So, what does Sean Dupree do? Well, the little punk that he is he just runs out of there and what does he do? He

don't come—he don't run around to . . . where he lives and say mama, I've just done a terrible thing, call the cops, you know, I just killed somebody. No he runs for not one, two or three days, not even for a week or two. He stays away for four solid weeks, says he calls his mother one time in four weeks after he just killed somebody. Now, does that make any sense? Why does he stay away? Because he just killed somebody for absolutely no reason at all. *Why doesn't he tell the officers I'm sorry, I had a gun, I saw a gun. Why can he not tell the officers that he had—that Hulbert had a gun?* Because Hulbert Clark did not have a gun. That's called—that defense is called desperation and speculation. I got to think of something quick to tell these twelve people, that I was trying to defend myself.

* * * * * *

Maybe he thinks I can get away with this. I'll stay away for a month, finally turn myself in. *Why didn't he tell the cops [Hulbert Clark] had a gun?* Because he didn't. Because he didn't. Hulbert did not have a gun. He wants you to believe he had a gun so he can think of this perfect or imperfect self-defense, but ladies and gentlemen of the jury, we have got to call this what it is. . . . This is first degree murder. [Emphases added.]

The jury convicted Dupree of second degree murder and use of a handgun in the commission of a crime of violence, in violation of Maryland Code (1957, 1996 Repl.Vol., 1998 Supp.) Article 27, § 411 and § 36B (d), respectively. The trial court sentenced Dupree to the Department of Corrections for a term of twenty years, the first five without the benefit of parole, on the handgun count, and to a consecutive term of thirty years on the murder count. Dupree noted a timely appeal to the Court of Special Appeals. That court affirmed Dupree's convictions in an unreported opinion.

II.

Petitioner argues that Detective Petrey's testimony informing the jury that he advised Dupree of "his rights according to

procedure" violated Dupree's rights under the Fifth and Four-teenth Amendments to the United States Constitution as well as his rights under Articles 22 and 24 of the Maryland Declaration of Rights. The State was permitted to accomplish indirectly what it is constitutionally forbidden to do directly, that is, present to the jury evidence that Dupree remained silent after being apprised of his *Miranda* rights. Dupree asserts that the detective's testimony regarding his *Miranda* warnings, combined with the absence of any statement by the defendant thereafter, left the jury with the unmistakable impression that Dupree chose to exercise his right to remain silent, a choice that some persons commonly view as indicative of guilt. Dupree also argues that the challenged testimony, short of any constitutional infringement, was nonetheless "inadmissible under the rules of evidence in that it was plainly irrelevant to any issue in the case."

The State counters that there was no constitutional error in Petitioner's trial because "there was absolutely no mention to the jury that Dupree even exercised his Fifth Amendment privilege ... nor was there any attempted use of this silence by the prosecution." By itself, Detective Petrey's testimony that he advised Dupree of his *Miranda* rights did not amount to reversible error. The State stresses that it is the particular *use* of post-arrest silence that must be reviewed for possible constitutional violation, not the mere mention that an arrestee was advised of his rights. Because the State did not exploit the "single reference to the fact that Dupree was advised of his 'rights,'" Dupree's conviction should be affirmed. Moreover, Dupree's contention for the first time before this Court that the prosecutor's closing remarks comprised the illicit exploitation misapprehends the State's argument. The prosecutor's summation referenced Dupree's flight from the scene and month-long absence before turning himself in to the police; in no way did it focus upon Dupree's post-arrest silence. Finally, the State does not specifically rebut Petitioner's relevancy argument but contends that "[a]ny error in admitting testimony of Dupree's 'rights' advisement was harmless."

## III.

As we embark upon our duty to resolve the question presented in this case we take note of this Court's decision in confronting a similar matter almost two decades ago. *State v. Raithel,* 285 Md. 478, 404 A.2d 264 (1979), presented the question "whether a trial court's use of an accused's silence at a prior suppression hearing to impeach his credibility when the defendant subsequently testifies at a second suppression hearing is permissible." *Id.* at 479, 404 A.2d at 264. The Court of Special Appeals had reversed Raithel's convictions for first degree murder, assault with intent to rape, and carrying a deadly weapon on the ground that the Fifth Amendment "privilege against self-incrimination prevents an accused's silence at a prior hearing from being considered in assessing his credibility." *Raithel v. State,* 40 Md.App. 107, 117, 388 A.2d 161, 167 (1978). This Court affirmed the intermediate court but under a different rationale. Judge Eldridge, writing for the court, stated:

[N]othing is better settled than the principle that courts should not decide constitutional issues unnecessarily. In the instant case, the Fifth Amendment issue only arises if the defendant's silence at the first suppression hearing was proper impeaching evidence as a matter of Maryland evidence law. In our view, under the circumstances of this case, the defendant's silence should not have been considered by the trial court regardless of any Fifth Amendment considerations. Consequently, we resolve the question presented in this case on that non-constitutional ground, and we do not reach any of the constitutional issues dealt with by the Court of Special Appeals and the State in its argument.

*Raithel,* 285 Md. at 484, 404 A.2d at 267.

In the present case, the constitutional issues debated by Petitioner and the State need be resolved by this Court only if the testimony regarding Dupree's receipt of *Miranda* warnings was proper as a matter of Maryland evidentiary law. Under our rules of relevancy, if evidence lacks any tendency

to make the existence of any fact that is of consequence to the determination of the defendant's guilt more probable or less probable, that evidence must be excluded. *See* Maryland Rules 5–401 and 5–402. It is well settled that "the admission of evidence is committed to the considerable and sound discretion of the trial court." *Merzbacher v. State,* 346 Md. 391, 404, 697 A.2d 432, 439 (1997), and cases cited therein. *See also Hunt v.* State, 321 Md. 387, 425, 583 A.2d 218, 236 (1990); *Johnson v. State,* 303 Md. 487, 527, 495 A.2d 1, 21 (1985); *Durkin v. State,* 284 Md. 445, 453, 397 A.2d 600, 605 (1979). The trial court's determination of relevancy will, however, be overturned on appeal for clear abuse of discretion. *See Merzbacher,* 346 Md. at 404–05, 697 A.2d at 439; *White v. State,* 324 Md. 626, 637, 598 A.2d 187, 192 (1991); *Johnson,* 303 Md. at 527, 495 A.2d at 21; *Durkin,* 284 Md. at 453, 397 A.2d at 605.

■ We hold that because the disputed testimony lacked the threshold relevancy necessary for admissibility, the trial court abused its discretion in allowing its presentation to the jury. It is therefore unnecessary to address the constitutionality of informing the jury of *Miranda* advisement where no pre-trial statement by the defendant is to be offered. We find it helpful, nevertheless, to consider similar cases, the majority of them based upon related constitutional grounds, in reasoning through and arriving at our decision in this case.

■ It is well established that the prosecution's use for impeachment purposes of a criminal defendant's silence at the time of arrest, after the defendant has been advised of *Miranda* rights, is a violation of the Fourteenth Amendment's guarantee of due process. *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976). It is fundamentally unfair to induce the defendant's silence by giving *Miranda* warnings, only then to punish the invocation of the constitutional right to remain silent by using that silence to impeach the defendant's testimony at trial. *Id.* at 618, 96 S.Ct. at 2245. In reaching this conclusion the Supreme Court reasoned:

Silence in the wake of [*Miranda* ] warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested.

*Id.* at 617, 96 S.Ct. at 2244 (citing *United States v. Hale,* 422 U.S. 171, 177, 95 S.Ct. 2133, 2137, 45 L.Ed.2d 99 (1975) in which the Court had ruled, under its supervisory authority over the federal courts, that the use of post-arrest, post-*Miranda* silence was impermissible because silence at the time of arrest is likely to be ambiguous and thus enjoys only dubious probative value).

The issue presented in the instant case is of a similar kind, yet different degree. Petitioner's central contention is that presentation to the jury of the mere advice of *Miranda* rights to a defendant upon arrest constitutes a violation of the rule pronounced in *Doyle* where no pre-trial statement by the defendant is to be admitted into evidence. There appears to be no case, state or federal, that has found a *Doyle* violation under such circumstances. In fact, several courts have held that the admission of testimony as to the giving of *Miranda* warnings, despite the defendant's exercise of the right to remain silent, does not amount to constitutional error. *United States v. Whitley,* 734 F.2d 1129, 1135 (6th Cir.1984), *abrogation on other grounds recognized by United States v. Robinson,* 887 F.2d 651, 653 (6th Cir.1989); *United States v. Jonas,* 639 F.2d 200, 205 (5th Cir.1981); *Collins v. State,* 464 N.E.2d 1286, 1290 (Ind.1984); *State v. Carter,* 335 N.C. 422, 440 S.E.2d 268, 273 (N.C.1994).

■ A somewhat related conclusion is universally accepted: evidence concerning the advice of *Miranda* rights followed by testimony as to the defendant's waiver of those rights, and as to any inculpatory statement given thereafter by the defendant, is permissible in order to enable the jury to assess the voluntariness of the putative waiver and to accord the subsequent statement whatever weight and credibility the jury deems appropriate. *See, e.g., United States v. De La Luz*

*Gallegos,* 738 F.2d 378, 381–82 (10th Cir.1984) ("A relevant purpose for admitting testimony that a defendant was advised of his rights under *Miranda* is to lay a proper foundation for the admission of any statements made by a defendant thereafter" because it is the jury that must ultimately determine voluntariness of and proper weight to give to such statements.) (citations omitted); *State v. Stuckey,* 680 S.W.2d 931, 938 (Mo.1984) (no error in simply showing that *Miranda* warnings were given; prosecution was entitled to show defendant's statements were made voluntarily and that defendant had been clearly advised he was under no obligation to make any statement). *See also United States v. Two Bulls,* 577 F.2d 63, 66 (8th Cir.1978) *(per curiam). Cf. Hillard v. State,* 286 Md. 145, 151, 406 A.2d 415, 419 (1979) (For criminal trials, the common law of Maryland requires "that the voluntary nature of a confession be twice established before it can be utilized by the trier of fact, together with any other evidence, in determining guilt or innocence—initially, to the satisfaction of the trial judge, out of the hearing of the jury, as a mixed question of law and fact, and then, if the statement has been placed in evidence, by a determination of the trier of fact, be it court or jury, that beyond any reasonable doubt the confession was freely and voluntarily made.") (citations omitted).

In contrast, it is much less clear whether testimony as to *Miranda* warnings followed by an indirect reference to and/or comment upon the fact that the arrestee remained silent in the wake of such warnings constitutes a *Doyle* violation. Some courts have determined that the admission of such testimony is not error unless expressly or purposefully used by the prosecution as substantive evidence of guilt or as impeachment. *See Noland v. French,* 134 F.3d 208, 216 (4th Cir.1998) (noting that other circuits have held mere mention of defendant's exercise of *Miranda* rights not prohibited *per se* ), *cert. denied,* —— U.S. ——, 119 S.Ct. 125, 142 L.Ed.2d 101 (1998); *United States v. Higgins,* 75 F.3d 332, 333 (7th Cir.1996) (holding that not all mention at trial of *Miranda* warnings and defendant's response to them is forbidden; what is forbidden is use against defendant of his silence following receipt of

warnings); *Jones v. Stotts,* 59 F.3d 143, 146 (10th Cir.1995) (stating that "mere mention of a defendant's request for counsel is not per se prohibited; rather, it is the prosecutor's exploitation of a defendant's exercise of his right to silence which is prohibited."); *United States v. Stubbs,* 944 F.2d 828, 835 (11th Cir.1991) (ruling that single comment on arrestee's post-arrest silence not a *Doyle* violation where prosecution did not "specifically and expressly attempt to use . . . the improper comment to impeach the defendant"); *Lindgren v. Lane,* 925 F.2d 198, 202 (7th Cir.1991) (stating that *"Doyle* does not impose a prima facie bar against any mention whatsoever of a defendant's right to request counsel, but instead guards against the exploitation of that constitutional right by the prosecutor."); *Ferreira v. Fair,* 732 F.2d 245, 248 (1st Cir. 1984) (finding no constitutional error in officer's testimony that arrestee did not respond when asked whether he understood his *Miranda* rights in part because prosecutor did not "make use of [the defendant's] silence, either substantively or for impeachment"); *McKenzie v. State,* 274 Ind. 276, 410 N.E.2d 1308, 1310 (Ind.1980) (ruling that officer's testimony that defendant indicated understanding of *Miranda* rights not improper comment on silence); *Stogner v. State,* 627 So.2d 815, 819–20 (Miss.1993) (holding that trial court did not err in admitting testimony that defendant fainted after being advised of *Miranda* rights because "[f]ainting . . . is not the same as saying [defendant] refused to testify").[1]

---

**1.** In some instances the rule in *Doyle* may be altogether inapplicable. For instance, the Supreme Court has stated that

the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest.

*Doyle v. Ohio,* 426 U.S. 610, 619–20 n. 11, 96 S.Ct. 2240, 2245 n. 11, 49 L.Ed.2d 91 (1976). *See also Greer v. Miller,* 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (holding that no *Doyle* violation occurred despite the fact that the prosecution opened its cross-examination of the defendant by asking, "Why didn't you tell this story to anybody when you got arrested?" Because the trial court immediately sustained

Other courts have applied *Doyle* more stringently and have held that even an indirect reference to or comment upon the defendant's post-*Miranda* silence violates due process. *See People of Territory of Guam v. Veloria,* 136 F.3d 648, 651–53 (9th Cir.1998) (plain error based on *Doyle* for court to admit officer's testimony that arrestee chose not to waive *Miranda* rights and requested legal counsel); *United States v. Elkins,* 774 F.2d 530, 537–38 (1st Cir.1985) (because "*Doyle* violation occurs not only when the objectionable comments explicitly refer to a defendant's failure to answer questions … but when the reference to defendant's silence is more oblique," trial court's refusal to strike testimony that defendants showed no surprise when arrested and read *Miranda* rights was constitutional error); *United States v. Wycoff,* 545 F.2d 679, 681–82 (9th Cir.1976) (testimony that defendant refused to sign *Miranda* rights waiver card and stated a preference to consult an attorney comprised error under *Doyle,* yet was ultimately harmless);[2] *State v. DiGuilio,* 491 So.2d 1129, 1131 (Fla.1986) (constitutional error for officer to testify that defendant advised him that "he felt like he should speak to his

---

defense counsel's objection, the prosecutor did not pursue the issue further nor mention it during closing argument, and the judge gave the jury two related curative instructions, the prosecution was prevented from availing itself of what *Doyle* forbids: the *use* of post-arrest, post-*Miranda* silence for impeachment).

2. It can be argued that the Supreme Court's holding in *Greer v. Miller,* 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), effectively abrogated the principal holding of *Wycoff,* 545 F.2d 679 (9th Cir.1976). The Ninth Circuit found a *Doyle* error in the admission of the disputed testimony yet held it to be harmless in part because "the trial judge admonished the jury to completely disregard the testimony" with instructions that were "prompt and forceful." *Id.* at 682. Under similar circumstances, the Supreme Court ruled that no *Doyle* violation occurred because the trial court did not permit the inquiry forbidden by the rule in that case, explicitly sustaining defense counsel's objection to the disputed testimony and later instructing the jury to disregard any questions to which an objection was sustained. *Miller,* 483 U.S. at 764–65, 107 S.Ct. at 3108. Even so, our reliance upon *Wycoff* is not with regard to its decision of constitutional law but upon its rationale as to the lack of evidentiary value of the *Miranda*-related testimony in that case.

attorney" because the comment was "fairly susceptible of being interpreted by the jury as a comment on silence").

The preceding cases admittedly do not address the admission into evidence of Miranda warnings alone. Even so, the reasoning provided by some of these opinions, as well as others, regarding the evidentiary value of *Miranda* warnings in the context of a defendant's silence or statement is instructive. The Ninth Circuit has unequivocally stated

> The *only relevant purpose* for showing that [the defendant] was advised of his rights is to lay a proper foundation for the admission of any statements given thereafter by an accused. In the present case there were absolutely no statements given to [the police] by [the defendant]. By eliciting such testimony, the government put before the jury the fact that [the defendant] remained silent and requested an attorney. The natural tendency of the use of the testimony in this manner is to prejudice the defendant by attempting to create an inference of guilt in the jury's mind.

*Wycoff,* 545 F.2d at 681 (emphasis added).

The Eighth Circuit *per curiam* has concurred in this assessment of the limited relevance of *Miranda* warnings, declaring that absent certain atypical situations, "the detailed conversation relating to *Miranda* warnings ordinarily ought not be admitted into evidence if no statement is given." *Two Bulls,* 577 F.2d at 66. Similarly, the Fifth Circuit has noted, "[S]ince no statements obtained as a result of any prior interviews were introduced in evidence, the *Miranda* requirements are not relevant." *United States v. Brown,* 459 F.2d 319, 322 n. 2 (5th Cir.1971) (citing *Allen v. United States,* 384 F.2d 926, 927 (5th Cir.1967) *(per curiam )* ("We note further that the *Miranda* requirements would not be relevant where no evidence was introduced at the trial.")).

In another Eighth Circuit case, the court frowned upon the prosecutorial practice of eliciting testimony as to *Miranda* warnings where no statement had been given. While finding the practice to be non-error constitutionally, or, alternatively, harmless error under the circumstances of the case, the court

opined that "it is clearly advisable that it should not be done." *United States v. Brown*, 584 F.2d 252, 261 (8th Cir.1978) (harmlessness of assumed error based upon prosecution's not pursuing *Miranda* testimony further and not mentioning it in closing argument as well as defense counsel's declining trial court's offer to instruct jury to disregard testimony in question).

In circumstances where, rather than giving no statement, the defendant offered explanations that were "exculpatory or innocuous," the Ninth Circuit again stated forcefully the rationale for prohibiting testimony as to *Miranda* issues unless a subsequent *inculpatory* statement is to be presented to the jury:

> [W]hen the defendant's subsequent statements are *exculpatory* or *innocuous* ... voluntariness is simply not an issue. In such cases, there is nothing to indicate that the defendant's statements were involuntarily made, and the defendant does not oppose their admission into evidence. Thus, the testimony concerning the defendant's invocation of *Miranda* rights is not probative, although it is potentially highly prejudicial.

> Unlike cases where the defendant has subsequently made inculpatory statements, in cases ... where the defendant has made only exculpatory or innocuous statements, *Miranda*-related testimony will be far *more* prejudicial than the defendant's subsequent statements: it is the only evidence creating an inference that the defendant is guilty. As a result, the potential prejudicial impact of the *Miranda*-related testimony will far outweigh any possible probative value such testimony could have.

*United States v. Valencia*, 773 F.2d 1037, 1042 (9th Cir.1985) (citations omitted). Based upon this rationale, the court held that admission of testimony regarding the defendant's refusal to sign a *Miranda*-waiver form violated due process. *Id.* It stands to reason, *a fortiori*, that where the defendant has offered *no* statement, the prejudice inherent in the admission of *Miranda*-related testimony far outweighs any probative value such testimony could have: it lays ground for the double

inference that the defendant invoked his right to remain silent and is therefore guilty.

Finally, Dupree's invocation of the Court of Special Appeals' decision in *Zemo v. State,* 101 Md.App. 303, 646 A.2d 1050 (1994) is appropriate. There the unanimous court held, "The jury, of course, has no need to know the course of an investigation unless it has some direct bearing on guilt or innocence. That an event occurs in the course of a criminal investigation does not, *ipso facto,* establish its relevance." *Id.* at 310, 646 A.2d at 1053. Here, the prosecutor's entire justification for proffering the disputed testimony was simply to show that Dupree's "rights were enforced." More specifically, the *Zemo* opinion's cogent assessment of the nugatory probative value of *Miranda* warnings, notwithstanding the court's own explicit limitations regarding its pronouncement, applies with full force to the instant case, our resolution of which purposefully avoids the constitutional inquiry undertaken by *Zemo,* instead relying solely upon the pertinent evidentiary considerations:

What legitimate relevance to the appellant's guilt or innocence, we ask initially, did it possibly have that he had been "read ... *Miranda?*" If he had given a *"Mirandized"* statement that the State were offering in evidence, then, to be sure, the State might have to show *its* compliance with *Miranda* at the very threshold of admissibility. Where no statement was being offered and tested for admissibility, on the other hand, the appellant's silence in response to the *Miranda* warnings was immaterial. *Indeed, the very giving of the Miranda warnings was immaterial.* Indeed, the very fact that the appellant had even been interviewed was immaterial.

Nothing of any conceivable significance was being established by such references. What, moreover, was the possible downside? Every lawyer knows that *Miranda* warnings are required only when a suspect is in the throes of custodial interrogation. Every layman knows that the police give *Miranda* warnings to those whom they have arrested and whom they are about to question for involvement in a crime. The gratuitous reference to *Miranda* told the jury something about the appellant. In the world view of the laity,

"good guys" don't get *"Mirandized."* At the very least, those who the police think are "good guys" don't get *"Mirandized."*

*Id.* at 315, 646 A.2d at 1056 (emphasis added).[3]

Likewise, in the instant case, the prosecution's needless insistence that the jury be informed that Dupree was "read his rights" put before the jury evidence that was immaterial to any issue in the trial. Because Dupree gave no statement to the police at the time of his arrest, the *Miranda* warnings were not needed by the jury to complete its appointed task. That Detective Petrey advised Dupree of his right to remain silent, which may or may not have been the catalyst of Dupree's subsequent silence, is irrelevant. Under these circumstances, the trial court abused its discretion in admitting such testimony. *See* Maryland Rules 5–401 and 5–402.

## IV.

 We now turn to consider whether the error committed by the trial court was harmless beyond a reasonable doubt.

---

3. Succeeding this passage from *Zemo* was the following advisory footnote, relied upon by the Court of Special Appeals as the sole basis for rejecting Dupree's claims in the present case:

> Our mention of the gratuitous reference to the giving of the *Miranda* warnings is only for the purpose of placing in fuller context the subsequent gratuitous reference to the appellant's silence in response to those warnings. *We are by no means intimating that a gratuitous reference to the giving of* Miranda *warnings would ever, in and of itself, constitute cause for reversal.* Any citation of our remarks above as authority for such a proposition would be an erroneous citation as support for a principle for which this opinion does not stand.

*Zemo v. State,* 101 Md.App. 303, 316 n. 1, 646 A.2d 1050, 1056 n. 1 (1994) (emphasis added). The intermediate court in the instant case determined that Detective Petrey's testimony amounted to no more than such a "gratuitous reference." The State's purposeful elicitation of the disputed testimony, over defense counsel's repeated objection, would seem to indicate that the reference was hardly gratuitous. More importantly, the footnote appeared in the context of addressing the possibility of a violation of the appellant's right to due process, a violation the court ultimately recognized. That the passage may lack authority for finding a constitutional error under the circumstances of the present case does not detract from its essential contention: the irrelevancy of *Miranda* warnings succeeded by the arrestee's silence.

*See Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976). Given that error occurred in Dupree's criminal prosecution, his convictions cannot stand unless, upon our own independent review of the record, this Court is able to conclude, beyond a reasonable doubt, that the error in no way influenced the verdict. *Id.* at 659, 350 A.2d at 678.

▉ Once the State put before the jury the fact that Dupree had been advised of his rights yet offered no evidence of a subsequent statement by Dupree, the inference of Dupree's silence, and thus his guilt, lay dangling for the jury to grab hold. It may well be so that the jury did "take the bait." In our nation, the advice of rights upon arrest, and particularly of the right to remain silent upon arrest—or to refuse to testify during one's criminal trial, or to "plead the Fifth"—is widely known. Combined with this commonplace knowledge of the right to remain silent and what it signifies is the taint its invocation places on those who exercise it.

Yet the clear prejudice against Dupree derives from the State's closing remarks, however arguably subtle or possibly misinterpreted they might have been.[4] Without a doubt, the prosecutor was attacking Dupree's credibility in general and his plea at trial of self-defense in particular. It may well be true that the prosecutor tried valiantly and earnestly to avoid comment on Dupree's post-arrest, post-*Miranda* silence and meant only to impeach his trial defense by directing the jury's attention to the month-long period between the shooting and Dupree's surrender. It was at best a risky trial tactic in light of the heavy burden the State faces should error be established. Neither unfair nor unjustified, however, is the interpretation that the State, in offering the evidence of *Miranda*

---

4. As to the arguable claim that defense counsel's failure to object to the prosecutor's closing argument renders our consideration of the remarks beyond the appropriate scope of appellate review, we note that such an omission might be relevant were the comments being factored into the determination of error. Whereas we are now resolving the issue of possible prejudice caused by the error we have found, *supra* Part III, defense counsel's non-reaction does not bear the same procedural significance.

warnings and in summing up the evidence as it did, wanted the jury both to consider and to penalize Dupree for exercising his constitutional right to remain silent upon his arrest.

Dupree's hopes of acquittal on the basis of perfect self-defense or a conviction reduced from murder to manslaughter because of imperfect self-defense hinged upon the jury's crediting his testimony. His trial defense was not a frivolous one: Green and Roberts, the two eyewitnesses who testified, were both uncertain as to the nature of the verbal and/or physical altercation between Dupree and Clark before the shooting occurred. In addition, the absence of Antoine Williams, the last person known to be near Clark's fallen body before police arrived, gave rise to the possibility that Williams had "tampered" with evidence by absconding with the gun that Dupree claimed Clark had used to threaten him before he shot in self-defense. Hence, any attack upon Dupree's credibility "struck at the jugular" of his trial testimony, *United States v. Harp,* 536 F.2d 601, 603 (5 th Cir.1976) (*per curiam*), and "went to the heart of [his] sole defense," *United States v. Johnson,* 558 F.2d 1225, 1230 (5 th Cir.1977). Given the circumstances of this case and the likely, if not probable, prejudice to Dupree's exculpatory explanation at trial, we cannot find the evidentiary error committed by the trial court harmless beyond a reasonable doubt.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE CONVICTIONS AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.*