863 A.2d 321

**Elsa NEWMAN**

v.

**STATE of Maryland.**

**No. 31, Sept. Term, 2004.**

Court of Appeals of Maryland.

Dec. 13, 2004.

Paul V. Jorgensen, Middletown, Barry H. Helfand (David A. Martella, Rockville; Michael A. Wein, Greenbelt), on brief, for petitioner.

Byron L. Warnken, Michael P. Lytle, Baltimore, brief of the Maryland Criminal Defense Attorneys' Assoc., for petitioner, amicus curiae.

Edward J. Kelley, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and WILNER, CATHELL, HARRELL, BATTAGLIA, John C. ELDRIDGE (Retired Specially Assigned) LAWRENCE F. RODOWSKY (Retired Specially Assigned), JJ.

BATTAGLIA, Judge.

This case presents the issue of the proper scope of the attorney-client privilege and whether a curative instruction adequately counteracted the prejudice of eliciting testimony about the exercise of a defendant's *Miranda* rights. Because we find that the communications between Elsa Newman [hereinafter "Newman"] and her former attorney, Stephen Friedman [hereinafter "Friedman"], at issue in the present case fall within the attorney-client privilege and are not subject to the crime-fraud exception, we reverse the decision by the Court of Special Appeals and remand the case to the Circuit Court for a new trial. As guidance for the trial court on remand, we also will address whether the curative instruction adequately dispelled the prejudice caused by eliciting improper testimony about the exercise of Newman's *Miranda* rights.

## I. Background

### A. Facts

Newman and Arlen Slobodow [hereinafter "Slobodow"] married in 1990, and thereafter they had two sons together, Lars and Herbie. In 1999, Newman's marriage to Slobodow deteriorated and the couple began divorce and custody proceedings in the Circuit Court for Montgomery County, Maryland during which Newman was represented by Friedman. During the course of Friedman's representation of Newman in the spring of 2001, Friedman asked Newman's close friend, Margery Landry [hereinafter "Landry"], to be present in his

meetings with Newman for a "cool head in the room." Landry and Newman discussed various plans involving harming Newman's children and blaming Slobodow while in Friedman's presence.

On August 31, 2001, Newman met with Friedman in preparation for a custody hearing on September 4, 2001 before Circuit Court Judge James Ryan. At one point during her meeting with Friedman, Newman stated, "You know, I don't have to kill both children. I only need to kill Lars because I can save Herbie, and then Arlen [Slobodow] will go to jail and get what he deserves because he is a criminal, and I can at least save Herbie."

Friedman disclosed to Montgomery County Circuit Court Judge Louise Scrivener the statements made by Newman the previous Friday. After Judge Scrivener informed Judge James Ryan of Friedman's disclosure, Judge Ryan announced the substance of Friedman's disclosure during the custody hearing on September 4, 2001. Newman was granted supervised visitation and Friedman's appearance as her counsel of record was stricken. The trial on the merits was postponed until December 7, 2001, and then again to January 28, 2002.

Prior to the trial on the merits, on January 7, 2002, at approximately 3:30 a.m., Landry entered Slobodow's house through an unlocked basement window carrying pornographic materials and a Smith and Wesson 9MM handgun. In Slobodow's bedroom, she found him asleep in bed and fired two shots hitting Slobodow once in the right leg. Slobodow struggled with Landry, pulling off her mask, and Landry fled the bedroom. Slobodow went downstairs, was attacked once more by Landry, and during the altercation bit Landry's finger. Landry left the house.

Later that morning, Montgomery County Police arrested Landry at her home. On January 9, 2002, the State of Maryland filed charges against Newman for conspiracy to commit first degree murder and conspiracy to commit assault in the first degree, and Newman was arrested the following day. Thereafter, Landry pled guilty to assault, burglary,

reckless endangerment, use of a handgun in the commission of a felony, and obliterating the serial number on a gun. On December 17, 2002, she was sentenced to fifty years imprisonment, with all but twenty years suspended.

## B. Procedural History

On April 4, 2002, Newman appeared in the Circuit Court for Montgomery County, Maryland and entered a plea of not guilty. On June 28, 2002, the Circuit Court held a pretrial hearing in which it considered the State's oral Motion in Limine to compel Friedman to testify about the matters that he had disclosed to Judge Scrivener. The State called Friedman to the stand. Newman requested that the court clear the courtroom prior to Friedman's testimony to preserve the confidentiality of Friedman's testimony prior to the court's ruling on its status under the attorney-client privilege. After the judge rejected that request, Newman asserted that the attorney-client privilege precluded Friedman's testimony, for which she was granted a standing objection. At the close of Friedman's testimony concerning his relationship with Newman and the content of his disclosure to Judge Scrivener pursuant to Rule 1.6 of the Maryland Rules of Professional Conduct,[1] the court ruled that Friedman acted reasonably in disclosing Newman's statements under Rule 1.6 and that his disclosure obviated Newman's attorney-client privilege regarding the disclosed statements.

---

1. Maryland Rule of Professional Conduct 1.6 provides:
 (a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).
 (b) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary
 (1) to prevent the client from committing a criminal or fraudulent act that the lawyer believes is likely to result in death or substantial bodily harm or in substantial injury to the financial interests or property of another;
 (2) to rectify the consequences of a client's criminal or fraudulent act in the furtherance of which the lawyer's services were used.

On August 2, 2002, the State called Friedman to the stand at Newman's trial. Under court order, Friedman testified as follows:

STATE: When—during that period of time from two to seven, aside from the break that you took, was there anyone else meeting—or in the room with you and Ms. Newman?

FRIEDMAN: I think I spared Ms. Rogers [his secretary] and let her do something else. She probably popped in and out, but mostly it was just me and Ms. Newman.

\* \* \*

FRIEDMAN: She had stopped being in a rage, got very quiet, very thoughtful, and tilted her head a little, and her eyes rolled up, and spoke in a voice different from her normal voice.

STATE: What did she say?

FRIEDMAN: She said, "You know, I don't have to kill both children. I only need to kill Lars because I can save Herbie, and then Arlen will go to jail and get what he deserves because he is a criminal, and at least I can save Herbie."

STATE: What was your response when she said this to you?

FRIEDMAN: Well, this had been going on all day—actually it had been going on for two years. What I said to her is what I would say to her in the past, and that is, "Ms. Newman, this is like talking about a bomb in the airport."

"There are consequences when you say things like that. You cannot involve me in a murder case, and you need to convince me that you are just frustrated, and angry, and scared to death," and Ms. Newman was just scared to death before trial. She would be so scared she couldn't prepare for trial. I think that is why she was firing me, she wouldn't come in to meet with me because she was so horrified of going to court, that is what I wanted to rationalize, and I said, "You need to convince me that you are just

upset—not say it, you need to convince me, or otherwise, I am going to tell Judge Ryan."

\* \* \*

STATE: About how many times do you think she told you that she was considering killing Arlen [Slobodow]?

FRIEDMAN: She and Margery [Landry] literally sat in front of me in my office and conspired to do it, that is why I had to bar Margery from coming into my office [2]

\* \* \*

STATE: When did that happen, Mr. Friedman?

FRIEDMAN: It happened twice.

\* \* \*

STATE: And could you tell us about that conversation?

FRIEDMAN: Elsa and Margery would sit in my office— and I invit[ed] Margery into the conversations because I wanted what I thought would be a cool head in the room.

\* \* \*

FRIEDMAN: The first time it happened I was reading a report, and they literally sat there, and Elsa was terribly distraught because it was during a time where—and they do this is the District of Columbia—I mean it is almost ex parte—in the District of Columbia if somebody swears out an abuse allegation, they take your kids away from you, and they say, "Well, you can have a hearing in three to six months."

Well, in his case Elsa was in terrible agony because they gave the kids to the person that she was convinced was

---

**2.** We note that Friedman's testimony exceeded the scope of his testimony at the pretrial hearing to include communications involving Landry that were not part of his disclosure pursuant to MRPC Rule 1.6. The trial court did not hold a proceeding out of the presence of the jury to determine if the additional testimony was protected by the attorney-client privilege.

sexually abusing them, and if she was right, this was a monstrous screw up in the system, and they wouldn't give us a hearing.

So she is very distraught over this, and as I said, I cut women in this—I represent abused women, and this is some of the worst kind of abuse, and I cut people a lot of slack because I expect them to be appropriately very emotionally distraught, and she would sit there—and she sat there in front of me, and I was reading a report about something, and she was talking to Margie about shooting him and framing Arlen, and I will have to have an excuse—you know if—you know, should I do it, or how should we do it?

Should we hire someone, and she said, "No. No. Ruthann[3] said always do it [yourself] because when you try and hire somebody, you get caught."

(Footnotes added). Newman once again asserted that the attorney-client privilege precluded the admission of Friedman's testimony, which the court rejected.

During the trial, the State also called Detective Mercer, the officer who arrested Newman, to testify in its case in chief, and asked her, "And what rights did you advise [Newman] of?" Detective Mercer responded, "That she had the right to remain silent, she had the right to an attorney. At which time she advised that she would like to consult with an attorney. Actually, she had an attorney waiting in the station lobby for her." Newman objected and moved for a mistrial. The trial court denied her motion and instead gave the jury the following curative instruction:

You have heard testimony that Elsa Newman was accompanied by an attorney when she appeared at the police station on January 10, 2002.

This is not evidence to be considered by you. Ms. Newman is presumed to be innocent of the charges against

---

**3.** Ostensibly referring to Ruthann Aron who pled no contest to hiring a hit man in 1997 to kill her husband. *See* Rafael Alvarez, *Ruthann Aron, Who Tried to Have Husband Killed, Released After Two Years 1994 Senate Candidate Pleaded No Contest*, BALT. SUN, Oct. 18, 2000, at 2B.

her. You have heard evidence that Ms. Newman's ex-husband, Arlen Slobodow, was shot on January 7, 2002.

Ms. Newman's house was searched following the shooting. She was aware of all this on January 10, 2002. It is fully consistent with the presumption of innocence that anyone under these circumstances would appear and consult with an attorney at the police station to protect his or her interests.

On August 6, 2002, the jury found Newman guilty of conspiracy to commit first degree murder, attempted first degree murder, assault in the first degree, burglary in the first degree, and use of a handgun in the commission of a felony. Newman filed a motion for a new trial, which the court denied. On January 24, 2003, Newman received four concurrent sentences of twenty years, one concurrent sentence of fifteen years, and upon release is required to serve five years supervised probation.

Newman filed a Notice of Appeal to the Court of Special Appeals. She presented eight issues for review in the Court of Special Appeals including the denial of Newman's motion to disqualify the Montgomery County State's Attorney's Office, the admission of Friedman's testimony, the denial of Newman's requested voir dire concerning bias, denial of Newman's motion for mistrial due to improper testimony concerning her *Miranda* rights, the admission of character evidence in the State's case in chief, the denial of Newman's requested jury instructions, the denial of Newman's motion for new trial, and the sufficiency of the evidence to convict Newman on any of the counts. *Newman v. State*, 156 Md.App. 20, 30, 845 A.2d 71, 77 (2003).

The Court of Special Appeals, in a reported opinion, held that Friedman's testimony was admissible under the crime-fraud exception to the attorney-client privilege because Newman evidenced an intent to commit future crimes. *Id.* at 49, 845 A.2d at 88. Moreover, the court determined that based on Friedman's two-year relationship with Newman and his role as an officer of the court, the State presented sufficient

evidence to establish that the statements expressed Newman's intended future acts. *Id.*

The court also concluded that the prejudice caused by the improper testimony of Detective Mercer that Newman was advised of her rights under *Miranda* and that Newman's attorney was awaiting her at the station was cured. *Id.* at 57, 845 A.2d at 93. After examining the facts of this case, the court determined that the prejudice caused by the reference to Newman's exercise of her *Miranda* rights did not exceed the curative instruction. *Id.* at 59–60, 845 A.2d at 94. Therefore, it held that the prejudice suffered by Newman was cured by the trial court's instruction. *Id.* at 60, 845 A.2d at 94–95. The Court of Special Appeals concluded, after analyzing the remaining six issues presented, that none constituted reversible error and affirmed the judgment of the trial court. *See generally Newman v. State,* 156 Md.App. 20, 845 A.2d 71 (2003).

We granted Newman's petition for writ of certiorari, *Newman v. State,* 381 Md. 674, 851 A.2d 593 (2004), which presented the following questions:

1. Did the trial court err in allowing Newman's domestic relations attorney to testify about confidential attorney-client communications?

2. Did the trial court abuse its discretion in denying Newman's Motion for Mistrial upon the State eliciting testimony about Newman's exercise of her *Miranda* rights?

3. Did the trial court abuse its discretion in allowing the State to introduce various forms of inadmissible character evidence?

4. Did the trial court err in denying Newman's Motion for a New Trial?

5. Did the trial court err in denying Newman's requested voir dire concerning the potential bias of members of the jury panel?

We hold that the trial court erroneously admitted Friedman's testimony concerning communications with Newman that were subject to attorney-client privilege. Because we

reverse the decisions of the Court of Special Appeals and Circuit Court and remand the case for a new trial on the basis of that error alone, we need not address the other issues raised in this appeal. As guidance for the trial court on remand, however, we will address the admission of testimony about Newman's exercise of her *Miranda* rights.

## II. Discussion

Newman argues that there was no justification for compelling Friedman to disclose statements that she claims are subject to attorney-client privilege. She asserts that the crime-fraud exception to the attorney client privilege, relied upon by the Court of Special Appeals, was never raised in the trial court because the trial judge only focused on the reasonableness of Friedman's prior disclosures under Rule 1.6. Newman asserts that allowing the Court of Special Appeals's decision to stand would irreparably damage the relationship between attorney and client.

Newman relies on our decision in *Harrison v. State,* 276 Md. 122, 151–52, 345 A.2d 830, 846–47 (1975), for the premise that a trial court initially must hear testimony outside of the jury to determine whether attorney-client privilege attaches to specific communications. She states that the use of *in camera* proceedings has been approved by the Supreme Court in *U.S. v. Zolin,* 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), to determine the application of the attorney-client privilege or an exception to that privilege.

Newman urges this Court to adopt the interpretation of the scope of the crime-fraud exception [4] set forth by the District of Columbia Court of Appeals in *In re Public Defender Service,*

---

4. The crime-fraud exception, as provided in the Restatement Third of the Law Governing Lawyers, is defined as:

> The attorney-client privilege does not apply to a communication occurring when a client:
> (a) consults a lawyer for the purpose, later accomplished, of obtaining assistance to engage in a crime or fraud or aiding a third person to do so, or

831 A.2d 890 (D.C.2003), that the exception applies only when the communications to the attorney are intended by the client to directly advance criminal or fraudulent activities with the attorney's assistance. Newman asserts that the fact that the communications concern a potential future crime is not sufficient to destroy the privilege. She claims that her statements in Friedman's presence were manifestations of the mental strain and anguish with which she struggled during the custody dispute with her ex-husband.

Newman also asserts that the trial court erred in denying her motion for mistrial after the State had elicited testimony from Detective Susan Mercer, the officer who arrested Newman and Landry, regarding Newman's exercise of her *Miranda* rights. Newman points to this Court's opinion in *Dupree v, State,* 352 Md. 314, 722 A.2d 52 (1998), which she interprets to mean that the mere mention that a defendant has been advised of his rights under *Miranda* is reversible error. Moreover, Newman contends that in *Hardaway v. State,* 317 Md. 160, 562 A.2d 1234 (1989), this Court held that the curative instruction is given in error if it would cause the jury to consider a defendant's post-*Miranda* silence. She asserts that the Supreme Court has held in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and *Brecht v. Gordon,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), that the use of a defendant's silence after being *Mirandized* is fundamentally unfair. Newman also finds fault in the trial court's curative instruction because it failed to advise the jury to draw no inferences from Newman's failure to make a statement to the police or protest her innocence. She argues that her election to consult with an attorney necessarily implies that she invoked her right to remain silent.

Concerning Newman's assertion of attorney-client privilege and the denial of her request for an in camera hearing, the

---

(b) Regardless of a client's purpose at the time of consultation, uses the lawyer's advice or other services to engage in or assist a crime or fraud.

Restatement (Third) of the Law Governing Lawyers, § 82 (2000, 2004 Cum.Supp.).

State counters that Newman failed to preserve her argument for an in camera hearing because she did not request one in the trial court. The State also argues that Newman's continuing objection was inadequate to preserve her claim that the examination of Friedman exceeded the scope of the trial court's pretrial ruling. Moreover, the State asserts that Newman waived her privilege with respect to statements made to Friedman when Landry was present during the discussion.

The State argues that the crime-fraud exception to the privilege applies to Newman's communications with Friedman. The State asserts that Newman used Friedman as a "sounding board" for her plan to kill her sons and husband and that she attempted to involve Friedman in her plans. The State claims that to overcome the crime-fraud exception Friedman would have had to have prevented Newman's perpetration of the crime, which, according to the State, did not happen because Slobodow was shot. Because the attack took place, the State asserts that the communications must be considered to be in furtherance of that crime. Even if the admission of Friedman's testimony was error, the State asserts that it was harmless in the present case because excluding Friedman's testimony would not have affected the jury's verdict in the case. Finally, the State claims that the failure to conduct an in camera hearing was not a procedural error because the trial court determined the admissibility of Friedman's testimony in a hearing outside the presence of the jury.

The State also argues that the decision whether to grant the motion is left to the trial court's discretion and that Detective Mercer's statement was an isolated comment. The State also distinguishes *Dupree v. State, supra,* and *Zemo v. State,* 101 Md.App. 303, 646 A.2d 1050 (1994), because the trial court in the present case immediately gave the jury a curative instruction.

### A. The Application of the Attorney Client Privilege

### The Scope of the Privilege

■ The Supreme Court has recognized the attorney client privilege as "the oldest of the privileges for confidential com-

munications known to the common law." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584, 591 (1981).

The attorney-client privilege dates back in the common law to the reign of Elizabeth I (1558–1603) and probably originated in the compulsion of witnesses to testify. *Harrison,* 276 Md. at 131, 345 A.2d at 836. Until 1776, it was not deemed to be a right of the client but rather was that of the attorney as a "point of honor" as an element of professional behavior. *Id.* In that year, "the House of Lords in the Duchess of Kingston's Trial (20 Howell, State Trials 355, 386 (1776)) ruled that her attorney, whom she had exempted from secrecy, was required to respond to questions about his conversations with her some three decades earlier, even though the attorney had demurred, raising the point of honor." *Id.* This development effectively ended the use of the "point of honor."

During the latter half of the eighteenth century another theory evolved which recognized that the client held a privilege which prohibited the disclosure of client secrets by the attorney, rather than simply permitting the attorney to keep "the client's confidences as a professional prerogative." *Id.* This theory rose to the forefront as the "point of honor" receded and soon was in use throughout the United States. *Id.,* citing 8 J. WIGMORE, EVIDENCE, §§ 2290–91 (McNaughton Rev.1961); C. McCORMACK, EVIDENCE, § 78 (2d ed.1972).

In 1862, in *Fulton v. MacCracken,* 18 Md. 528 (1862), this Court stated that "[n]o rule is better established than 'that communication which a client makes to his legal adviser for the purpose of professional advice or aid shall not be disclosed, unless by the consent of the client for whose protection the rule was established.' " *Id.* at 542–43. We have stated that the privilege is an accommodation of the competing public interests of the need to promote candor in communications between attorneys and their clients and the general testimonial compulsion to divulge relevant evidence in the pursuit of truth and justice. *See Harrison,* 276 Md. at 133, 345 A.2d at 837. It is so basic to the relationship of trust between an

attorney and client that, although it is not given express constitutional protection, it is essential to a defendant's exercise of the constitutional guarantees of counsel and freedom from self-incrimination. *Id.*

■ The privilege is understood to be "a rule of evidence that prevents the disclosure of a confidential communication made by a client to his attorney for the purpose of obtaining legal advice." *See E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.,* 351 Md. 396, 414, 718 A.2d 1129, 1138 (1998), citing *Levitsky v. Prince George's County,* 50 Md.App. 484, 491, 439 A.2d 600, 604 (1982). In *Harrison v. State, supra,* we adopted Professor Wigmore's definition of the attorney-client privilege:

(1) Where legal advice of [any] kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by his legal adviser, (8) except the protection [may] be waived.

276 Md. at 135, 345 A.2d at 838, quoting 8 JOHN H. WIGMORE ON EVIDENCE § 2292, at 554 (McNaughton rev. ed.1961) (footnote omitted). The common law privilege is codified in Section 9–108 of the Courts and Judicial Proceedings Article of the Maryland Code, which states, "A person may not be compelled to testify in violation of the attorney-client privilege." Md.Code (1974, 2002 Repl.Vol.), § 9–108 of the Courts and Judicial Proceedings Article.

■ The privilege, although essential to an effective attorney-client relationship, is not absolute. *In re Criminal Investigation No. 1/242Q,* 326 Md. 1, 11, 602 A.2d 1220, 1225 (1992). We have observed that "[o]nly those attorney-client communications *pertaining to legal assistance* and *made with the intention of confidentiality* are within the ambit of the privilege." *E.I. du Pont de Nemours,* 351 Md. at 416, 718 A.2d at 1138. This Court in *Lanasa v. State,* 109 Md. 602, 71 A. 1058 (1909), observed, "[T]o make the communications privileged, they ... must relate to professional advice and to the subject-matter about which the advice is sought." *Id.* at 617, 71 A. at

1064. *See also Morris v. State,* 4 Md.App. 252, 255, 242 A.2d 559, 561 (1968), quoting *Colton v. United States,* 306 F.2d 633, 637, *cert. denied* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963) ("[T]he privilege extends essentially only to the substance of matters communicated to an attorney in professional confidence.").

■ For a communication to be considered privileged, it cannot be intended for disclosure to third parties. *See E.I. du Pont de Nemours,* 351 Md. at 416, 718 A.2d at 1139. We have recognized, however, that disclosure to third parties, or the presence of third parties during a communication, does not automatically destroy the privilege. *See State v. Pratt,* 284 Md. 516, 520, 398 A.2d 421, 425–26 (1979) (holding that communications made to a psychiatrist in preparation for an insanity defense are protected by attorney-client privilege); *Rubin v. State,* 325 Md. 552, 568, 602 A.2d 677, 683–84 (1992) (declining to apply attorney-client privilege to communications to a private detective in attorney's employ where personal relationship with the detective motivated the communication).

### Friedman's Disclosure Under Rule 1.6 and the Attorney–Client Privilege

Whereas the attorney-client privilege addresses compelled disclosure of client secrets during judicial proceedings, client confidentiality under Rule 1.6 of the Professional Code relates to the attorney's general duty to maintain the confidentiality of all aspects of a client's representation. The attorney's duty to maintain the confidentiality of a client's communications is set forth in the Maryland Rules of Professional Conduct [hereinafter "MRPC"] Rule 1.6(a), which provides:

A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).

MRPC 1.6(a). It is subject, however, to significant exceptions:

(b) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:

(1) to prevent the client from committing a criminal or fraudulent act that the lawyer believes is likely to result in death or substantial bodily harm or in substantial injury to the financial interests or property of another;

(2) to rectify the consequences of a client's criminal or fraudulent act in the furtherance of which the lawyer's services were used.

MRPC 1.6(b).

■■■ There is a subtle relationship between the confidentiality required under Rule 1.6 and the evidentiary rule of the attorney-client privilege. *See Parler & Wobber v. Miles & Stockbridge, P.C.,* 359 Md. 671, 689, 756 A.2d 526, 536 (2000). The principle of confidentiality is given effect in both bodies of law. The attorney-client privilege applies in judicial and other proceedings in which an attorney may be called as a witness or otherwise required to produce evidence adverse to his client. *See* MRPC 1.6, cmt.; David A. Green, *Lawyers as "Tattletales": A Challenge to the Broad Application of the Attorney–Client Privilege and Rule 1.6, Confidentiality of Information,* 20 Ga. St. U.L.Rev. 617, 621–22 (2004) [hereinafter "Green"]; Daniel R. Fischel, *Lawyers and Confidentiality,* 65 U. Chi. L.Rev. 1, 1 n. 6 (1998). The rule of confidentiality embodied in Rule 1.6, however, applies in all other situations that do not involve the compulsion of law. MRPC 1.6, cmt.; *see also In re Estate of Wood,* 818 A.2d 568, 573 (Pa.Super.2003); *In re Bryan,* 275 Kan. 202, 61 P.3d 641, 656 (2003) Rule 1.6 also is not limited to "matters communicated in confidence by the client but also to all information relating to the representation," whether obtained from the client or through the attorney's independent investigation, MRPC 1.6, cmt., whereas the attorney-client privilege only protects communications between the client and the attorney. *See Harrison,* 276 Md. at 135, 345 A.2d at 838 (requiring that the communication be made by the client for the attorney-client privilege to attach); *Green, supra,* at 622; *Peters v. County Comm'n of Wood County,* 205 W.Va. 481, 519 S.E.2d 179, 186 (1999). Therefore, Rule 1.6 prohibits the disclosure of any information pertaining to the representation of a client, but

does not operate to render information inadmissible at a judicial proceeding. *See Parler & Wobber*, 359 Md. at 689–90, 756 A.2d at 536. Only communications subject to the attorney-client privilege cannot be disclosed under judicial compulsion.

In a case similar to the instant case, the Supreme Court of Massachusetts addressed the relationship between disclosure under a predecessor to Rule 1.6 and application of the attorney-client privilege in *Purcell v. District Attorney for the Suffolk District*, 424 Mass. 109, 676 N.E.2d 436 (1997). In that case, a client of Jeffrey Purcell, an attorney employed by Greater Boston Legal Services, threatened to burn down an apartment building where recently the client had been employed. *Id.* at 437. Purcell determined that he "should advise appropriate authorities that [his client] might engage in conduct harmful to others," and informed the Boston police. *Id.* At the client's trial, the prosecution subpoenaed Purcell to testify. *Id.* at 438. Purcell then filed an action requesting that the Supreme Court determine whether attorney-client privilege prohibited his testifying. *Id.*

In determining that a disclosure under DR 4–101(C)(3),[5] the disciplinary rule in effect prior to the adoption of Rule 1.6, did not make Purcell's testimony admissible, the court held that to permit such disclosures to then be used against the client at trial would cause lawyers to be "reluctant to come forward if they know that the information they disclose may lead to adverse consequences to their clients." *Id.* at 440. Moreover, the court noted that the use of such disclosures could chill the free discourse between the lawyer and the client, thereby limiting the lawyer's ability to thwart threats in the future. *Id.* Thus, the court held that disclosure to prevent future harm to others is not sufficient to overcome attorney-client privilege. *Id.* at 440–41.

---

**5.** Massachusetts DR 4–101(C)(3) permitted disclosure of a client's intention to commit any crime. The Massachusetts Supreme Court determined that the result in that case would have been the same if then-proposed Rule 1.6 were in effect.

We agree with the Massachusetts Supreme Court that such disclosure is not sufficient to obviate the attorney-client privilege and admit the statements as evidence against the attorney's client, not only because of the chilling effect of the obverse, but also because it pits the attorney, as advocate and adviser, against the client, when the client is charged with a crime. To permit a Rule 1.6 disclosure to destroy the attorney-client privilege and empower the attorney to essentially waive his client's privilege without the client's consent is repugnant to the entire purpose of the attorney-client privilege in promoting candor between attorney and client. Moreover, it would violate our duty to "maintain the integrity of the legal profession." *Attorney Grievance Comm'n v. Gansler*, 377 Md. 656, 701, 835 A.2d 548, 574 (2003). Therefore, we hold that Friedman's disclosure pursuant to Rule 1.6 of the Maryland Rules of Professional Conduct did not defeat Newman's assertion of the attorney-client privilege.

### Communications Made with Landry in the Presence of Friedman

The parties do not dispute that two statements made by Newman in the presence of Landry, about which Friedman testified, occurred during the existence of Newman's attorney-client relationship with Friedman or that the statements were related to Newman's divorce and custody dispute. They also do not dispute that Newman retained Friedman to act in his capacity as an attorney on her behalf. Rather, they diverge about the effect of Landry's presence at sessions with Friedman during which she and Newman discussed "kill[ing] Lars, Arlen [Slobodow] would be blamed, and then he would go to jail ... planting evidence [of pornography] in [Slobodow's] house."

As we have observed, generally the presence of a third party will destroy the attorney-client privilege. *See E.I. du Pont de Nemours*, 351 Md. at 416, 718 A.2d at 1139. The mere presence of a third party, however, does not constitute a waiver of the privilege per se. Because the attorney-client privilege is held and waived by the client, our essential inquiry

is " 'whether the *client* reasonably understood the conference to be confidential' *notwithstanding* the presence of third parties." *Rosati v. Kuzman,* 660 A.2d 263, 266–67 (R.I.1995), quoting *Kevlik v. Goldstein,* 724 F.2d 844, 849 (1st Cir.1984) (emphasis in original). *See also* MCCORMACK, EVIDENCE, § 91 at 189 (2d ed.1972) (explaining that a "mere showing that the communication was from client to attorney does not suffice, but the circumstances indicating the intention of secrecy must appear"); *Hearn v. Rhay,* 68 F.R.D. 574, 579 (E.D.Wash.1975) (noting that "[t]he attorney-client privilege is limited to communications between the attorney and the client which are expressly intended to be confidential"); *State v. von Bulow,* 475 A.2d 995, 1005 (R.I.1984) (stating that the communication is privileged if expressly intended to be confidential).

We find the analysis of the Supreme Court of Rhode Island in *Rosati v. Kuzman,* 660 A.2d 263 (R.I.1995), to be persuasive on this point. In that case, the court analyzed whether the presence of a defendant's parents during communications between the attorney and their son destroyed any attorney-client privilege. *Id.* at 266. Examining whether the son reasonably understood the communications to be confidential, the court observed that his parents "occupied a vital role in his defense." *Id.* at 267. They facilitated the son's relationship with the attorney, accepted other offers of assistance on their son's behalf, and acted as his confidants through a "tense legal proceeding." *Id.* The court relied upon those facts to determine that the son unequivocally intended that the communications in question remain confidential. *Id.* The fact that the third parties were the defendant's parents played no part in the court's conclusion.

The record in the case at bar indicates Newman's clear understanding that the communications made in the presence of Landry would remain confidential. Landry, as one of Newman's oldest and closest friends, accompanied Newman to Friedman's office in an attempt to "keep things more … focused, … to ease" the relationship between Friedman and Newman. Friedman testified that Newman was "distraught" over the possibility of losing custody of her children to their

father. He further testified that he "invited Margery [Landry] into the conversations [with Newman] because [he] wanted what [he] thought would be a cool head in the room." Later, due to the content of the conversations in his presence between Landry and Newman, Friedman stated, "[T]hat is why I had to bar Margery from coming into my office." Thus, Friedman exerted his control over Landry's presence through his ability to invite her and also exclude her from the meetings.

 Newman's acquiescence in Friedman's suggestion that Landry facilitate his meetings with her by providing a "cool head" cannot reasonably be interpreted as amounting to a waiver of her privilege, as the State suggests. Although Landry accompanied Newman to Friedman's office, there is nothing in the record to show that Newman suggested that Landry participate in her meeting with Friedman, and Friedman's testimony indicates that the opposite is true. We have held that "[o]nly the client has [the] power to waive the attorney-client privilege." *Parler & Wobber*, 359 Md. at 691, 756 A.2d at 537; *see City of College Park v. Cotter*, 309 Md. 573, 591, 525 A.2d 1059, 1067 (1987). Where the third party is acting at the attorney's behest, as Landry did in the present case, the client's consent to the third party's continued presence does not constitute waiver of the privilege because the decision to include the third party was not made by the client, but rather by the attorney. Therefore, Newman reasonably understood the communications in question to be confidential, and subject to the attorney-client privilege, because of Friedman's control over Landry's presence during their meetings.

Also, like Rosati's parents in *Rosati v. Kuzman, supra*, Landry acted as a source of support for Newman during divorce and custody proceedings which, according to all parties involved, were extremely contentious. She accompanied Newman to court proceedings, communicated directly with Friedman at Newman's direction, and assisted Newman in pursuing investigations of Newman's sons' allegations of sexual abuse with the proper authorities. Thus, we can discern no

significant distinction between the circumstances of *Rosati* and the present case. Consequently, we find that Landry's presence during Newman's meetings with Friedman does not destroy Newman's attorney-client privilege.

### The Crime–Fraud Exception and Its Application

■ The Court of Special Appeals found that Friedman's testimony about the content of his disclosure under MRPC Rule 1.6 was admissible under the crime-fraud exception to the attorney-client privilege. We disagree with the court's application of the exception.

■ The Restatement (Third) of the Law Governing Lawyers defines the crime-fraud exception as:

The attorney-client privilege does not apply to a communication occurring when a client:

(a) consults a lawyer for the purpose, later accomplished, of obtaining assistance to engage in a crime or fraud or aiding a third person to do so, or

(b) Regardless of a client's purpose at the time of consultation, uses the lawyer's advice or other services to engage in or assist a crime or fraud.

Restatement (Third) of the Law Governing Lawyers, § 82 (2000, 2004 Cum.Supp.). We have never explicitly accepted the existence of a crime-fraud exception to the attorney-client privilege under Maryland law. Nevertheless, we agree with the Supreme Court's assessment that it would be an abuse of the privilege to permit the attorney-client privilege to "extend to communications 'made for the purpose of getting advice for the commission of a fraud' or a crime." *United States v. Zolin*, 491 U.S. 554, 563, 109 S.Ct. 2619, 2626, 105 L.Ed.2d 469, 485 (1989). Thus, we hold that the crime-fraud exception applies in Maryland to exempt communications seeking advice or aid in furtherance of a crime or fraud, from the protection of the attorney-client privilege.

In the present case, the State suggests that we should opine that a statement of intention to commit a criminal or fraudulent act is equivalent to seeking advice or aid in furtherance of

committing that crime from an attorney, brings that utterance within the crime-fraud exception to the attorney-client privilege. We decline to so opine and join our colleagues on both the federal and state levels who have required more than a mere statement of the intent to commit a crime or fraud to trigger the crime-fraud exception to the attorney-client privilege. *See e.g., In re Richard Roe*, 168 F.3d 69, 71–72 (1999) (stating that the use of an attorney's services must be in furtherance of a crime or fraud for the exception to apply); *United States v. Chen*, 99 F.3d 1495, 1503 (9th Cir.1996) (same); *Haines v. Liggett Group Inc.*, 975 F.2d 81, 90 (3d Cir.1992) (same); *United States v. White*, 887 F.2d 267, 271 (D.C.Cir.1989) ("It does not suffice that the communications may be related to a crime. To subject the attorney-client communications to disclosure, they must actually have been made with an intent to further an unlawful act."); *In re Murphy*, 560 F.2d 326, 338 (8th Cir.1977) (same); *In re Grand Jury Investigation*, 842 F.2d 1223, 1226 (11th Cir.1987) (same); *In re International Systems & Controls Corporation Securities Litigation*, 693 F.2d 1235, 1242 (5th Cir.1982) (same); *State v. Madden*, 215 W.Va. 705, 601 S.E.2d 25, 37 (2004) ("The crime-fraud exception comes into play when a prospective client seeks the assistance of an attorney in order to commit a crime or perpetrate a fraud on a third party or the court."); *In re Public Defender Service*, 831 A.2d 890, 901 (D.C.2003) (reasoning that to create a crime-fraud exception that includes past statements made merely evidencing an intent to commit a crime or fraud, would undermine the attorney's ability to discourage such actions); *Purcell*, 676 N.E.2d at 441 ("[The crime-fraud] exception applies only if the client or prospective client seeks advice or assistance in furtherance of criminal conduct."); *Lane v. Sharp Packaging Systems, Inc.*, 251 Wis.2d 68, 640 N.W.2d 788, 806 (2002) ("The test for invoking the crime-fraud exception is whether there is " 'reasonable cause to believe that the attorney's services were utilized in furtherance of the ongoing unlawful scheme.' "), *Henderson v. State*, 962 S.W.2d 544, 553 (Tex. Crim.App.1997) ("[W]e cannot conclude that the crime-fraud

exception can be satisfied by the mere pendency of ongoing criminal activity or the mere threat of future activity. The attorney's services must be sought or used to further the activity in question."); *Kleinfeld v. State,* 568 So.2d 937, 939–40 (Fla.Dist.Ct.App.1990) (stating that Florida's crime-fraud exception required the client to seek the attorney's assistance in furthering the crime or fraud); *In the Matter of Nackson,* 114 N.J. 527, 555 A.2d 1101, 1105 (1989) (observing that the crime-fraud exception only applied where the client consulted with the attorney to obtain aid in the commission of a crime, to enable the client to avoid criminal prosecution, or to avoid lawful service of process); *People v. Paasche,* 207 Mich.App. 698, 525 N.W.2d 914, 917–18 (1994) (stating that to establish the crime-fraud exception it must be shown that the communication was in furtherance of a criminal or fraudulent enterprise), *In re Marriage of Decker,* 153 Ill.2d 298, 180 Ill.Dec. 17, 606 N.E.2d 1094, 1101 (1992) (defining the crime-fraud exception as only applying to communications with attorney in furtherance of a crime or fraud). To permit the mere statement of intent to defeat the attorney-client privilege would result in the exception swallowing the privilege.

The Court of Special Appeals only addressed the application of the crime-fraud exception to the communications disclosed by Friedman under MRPC Rule 1.6. *Newman v. State,* 156 Md.App. at 48–49, 845 A.2d at 88. There is nothing in the record indicating that Newman sought advice or assistance in furtherance of a crime when she stated her intention to kill her husband and children.[6] Friedman testified that he disclosed communications with Newman in an attempt to thwart her plans. Moreover, Friedman stated that Newman's threats were typical in hotly contested custody proceedings. The State relies upon Friedman's fear that he was in danger of becoming an "accessory before the fact of murder if [he] didn't do something" to show that Newman consulted with Friedman

---

**6.** Because we find no evidence in the record indicating that Newman's communications were made in furtherance of a future crime or fraud, we need not address the burden of proof required to establish that the communication was in furtherance of a future crime or fraud.

"in furtherance" of a future crime or fraud. Although it shows that Friedman viewed Newman's threats as serious, the testimony relied upon by the State does little more, and does not establish that Newman consulted with Friedman for the purpose of obtaining assistance in furtherance of a future crime or fraud. Therefore, the communication disclosed by Friedman pursuant to MRPC Rule 1.6 is not subject to the crime-fraud exception and is privileged.

Although the Court of Special Appeals did not address the application of the crime-fraud exception to the communications in Landry's presence, we will so do. The State relies upon Friedman's testimony that he felt that he was being "sucked into their plan" by Newman and Landry, and that they "were bringing [him] into this relationship." Those statements do not evidence any intent to seek assistance in furtherance of a crime, but rather only show that Friedman was uncomfortable with the content of the communications. The State's position that Newman solicited Friedman to assist her in her alleged scheme, or requested advice to accomplish it, is not supported in the record. Both the communication disclosed by Friedman pursuant to MRPC Rule 1.6 and the conversations held in the presence of Landry are privileged.

### Harmless Error

We must then consider whether the error committed by the trial court was harmless beyond a reasonable doubt. *See Dupree,* 352 Md. at 332–33, 722 A.2d at 61; *Dorsey v. State,* 276 Md. 638, 646, 350 A.2d 665 (1976). Newman's convictions cannot stand unless, "upon [our] own independent review of the record, [this Court] is able to conclude, beyond a reasonable doubt, that the error in no way influenced the verdict." *Dupree,* 352 Md. at 333, 722 A.2d at 61; *Dorsey,* 276 Md. at 659, 350 A.2d at 678. We cannot so conclude.

Although the State's other evidence established a close relationship between Newman and Landry, only Friedman's testimony connected Newman to Landry's attack on Slobodow and established the possible conspiracy. In light of the circumstantial nature of the State's case, we cannot conclude that

the erroneous admission of Friedman's testimony was harmless beyond a reasonable doubt. Therefore, we hold that the admission of Friedman's testimony in violation of Newman's attorney-client privilege was reversible error and we reverse the decision of the Court of Special Appeals with instructions to remand the case to the Circuit Court for Montgomery County for a new trial.[7]

---

**7.** The appropriate procedure to determine whether the attorney-client privilege or one of its exceptions applies was not followed with respect to the admissibility of Friedman's testimony about Newman's communications in Landry's presence.

First we note that the "party seeking the protection of the privilege bears the burden of establishing its existence." *E.I. du Pont de Nemours*, 351 Md. at 415, 718 A.2d at 1138; *In re Criminal Investigation 1/242Q*, 326 Md. at 11, 602 A.2d at 1225. Once the privilege is invoked, the trial court should "make a preliminary inquiry and hear testimony relative thereto out of the presence of the jury, looking at the surrounding facts and circumstances." *Harrison*, 276 Md. at 136, 345 A.2d at 838; *see* Md. Rule 5–104(c) (providing that a hearing on preliminary matters be heard outside the presence of the jury). In this preliminary inquiry, the trial court will decide as a matter of law whether the elements of the privilege are present and if so, whether the communication, absent an exception, is privileged. *E.I. du Pont de Nemours*, 351 Md. at 415, 718 A.2d at 1138. This threshold question must be determined without requiring the disclosure of the communication at issue. *Harrison*, 276 Md. at 136, 345 A.2d at 838; Md. Rule 5–104(a) (requiring strict application of the rules of evidence governing privilege).

In interpreting Federal Rule of Evidence 104(a), upon which Maryland Rule 5–104(a) is based, the United States Supreme Court stated in *Zolin* that an in camera review to determine whether the attorney-client privilege and/or the crime-fraud exception applied was permissible under Federal Rule of Evidence 104(a). 491 U.S. at 569, 109 S.Ct. at 2624, 105 L.Ed.2d at 482. It explained, however, that to be entitled to an in camera review, the party opposing the privilege must "present evidence sufficient to support a reasonable belief that [such] review may yield evidence that establishes the exceptions applicability." *Id.* at 574–75, 109 S.Ct. at 2632, 105 L.Ed.2d at 492. The party opposing the application of the privilege may use any evidence, independent of the content of the privileged communication to present its *prima facie* case that the crime-fraud exception applied. At this point in the preliminary inquiry, the party opposing the privilege would be required to proffer evidence demonstrating that the communication at issue was made with the object of seeking assistance in directly furthering an ongoing or future crime or fraud. *See Purcell*, 676 N.E.2d at 440; *In re Marriage of Decker*, 180 Ill.Dec. 17, 606 N.E.2d at 1101; *Paasche*, 525 N.W.2d at 917–18; *Haines*, 975 F.2d at 90; *In re Grand Jury Investiga-*

## B. Admission of Detective Mercer's Testimony

We shall, for the trial court's guidance, analyze the issues raised by Detective Mercer's testimony about Newman's *Miranda* warnings.

Newman asserts that testimony by Detective Mercer that she was *Mirandized* and that her attorney was waiting for her at the police station is an indirect comment on her post-*Miranda* silence because commenting on the presence of her attorney necessarily implicates the fact that Newman remained silent. As such, Newman argues that the trial court's curative instruction was inadequate and that her Motion for Mistrial was improperly denied.

The pertinent part of Detective Mercer's testimony is as follows:

STATE: Did you advise her of her rights?

DETECTIVE MERCER: Yes, sir.

STATE: And what rights did you advise her of?

DETECTIVE MERCER: That she had the right to remain silent, she had the right to an attorney. At which time she advised that she would like to consult with an attorney. Actually, she had an attorney waiting in the station lobby for her.

The United States Constitution and the Maryland Declaration of Rights guarantee the innocent and guilty alike the right to remain silent. *See* U.S. Const. amend. V (providing that "[n]o person ... shall be compelled in any criminal case to be a witness against himself"); Md. Const. Declaration of

---

tion, 842 F.2d at 1226; *In re International Systems & Controls Corporation Securities Litigation,* 693 F.2d at 1242; *In re Murphy,* 560 F.2d at 338.

We agree with the Supreme Court that an in camera hearing is an appropriate mechanism for determining the admissibility of allegedly privileged evidence during trial. Although the trial court held a pretrial hearing concerning Friedman's testimony about the communications disclosed under MRPC Rule 1.6, it failed to hold any proceeding outside the presence of the jury to determine the admissibility of Friedman's testimony about the communications made in Landry's presence, which were first revealed at trial.

Rights, art. 22 ("That no man ought to be compelled to give evidence against himself in a criminal case").[8] An inherent component of this guarantee is that one who invokes the privilege against self-incrimination shall remain free from adverse presumptions surrounding the exercise of such right. *See* Md.Code (1973, 2002 Repl.Vol.), § 9–107 of the Courts and Judicial Proceedings Article (providing that "[t]he failure of a defendant to testify in a criminal proceeding on this basis does not create any presumption against him"); *see Crosby v. State,* 366 Md. 518, 528, 784 A.2d 1102, 1107 (2001); *Younie v. State,* 272 Md. 233, 244, 322 A.2d 211, 217 (1974) (stating that no penalty shall flow from the exercise of one's right to remain silent).

Cognizant of the fundamental importance of the privilege against self—incrimination—an essential pillar of our adversarial system-the Supreme Court adopted certain procedural safeguards to ensure the protection of this right in the context of a custodial interrogation. Pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), an individual in police custody must be warned, prior to any interrogation, that he has the right to remain silent, that anything he says can be used against him in a court of law, and that he has the right to the presence of an attorney. *Id.* at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. The viability of *Miranda* was reenforced in *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

It is well established that the prosecution's use of post-*Miranda* silence to obtain a conviction is a violation of the Fourteenth Amendment's guarantee of due process. *Wainwright v. Greenfield,* 474 U.S. 284, 292, 106 S.Ct. 634, 639, 88 L.Ed.2d 623, 630–31.(1986); *Doyle,* 426 U.S. at 619, 96 S.Ct. at 2245, 49 L.Ed.2d at 98. A defendant's exercise of his right to remain silent includes his desire to remain silent until counsel

---

**8.** The Fifth Amendment is, of course, applicable to Maryland via the Fourteenth Amendment of the U.S. Constitution. *See Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653, 658 (1964).

has been consulted. *Wainwright*, 474 U.S. at 295 n. 13, 106 S.Ct. at 640 n. 13, 88 L.Ed.2d at 632 n. 13.

This Court has maintained that the right to remain silent "has always been liberally construed in order to give fullest effect to this immunity." *Crosby*, 366 Md. at 527 n. 8, 784 A.2d at 1107 n. 8, quoting *Allen v. State*, 183 Md. 603, 607, 39 A.2d 820, 821 (1944). Notably, we have previously interpreted Maryland's privilege against self-incrimination contained in Article 22 of the Maryland Declaration of Rights to be more comprehensive than that contained in the federal Bill of Rights. Judge Eldridge, writing for this Court in *Hardaway v. State*, 317 Md. 160, 161, 562 A.2d 1234 (1989), held that absent special circumstances, instructing a jury, over the defendant's objection, that the defendant has the constitutional right not to testify and that no adverse inference should be drawn from his election to remain silent, violated state common law and was reversible error. In so holding, this Court departed from Supreme Court jurisprudence which provides that the giving of a cautionary instruction over a defendant's objection does not violate his privilege against self-incrimination. *See Lakeside v. Oregon*, 435 U.S. 333, 340–41, 98 S.Ct. 1091, 1095, 55 L.Ed.2d 319, 326 (1978). The predicate for this deviation, which effectively extends a defendant's constitutional protections, was our State's common law and "the approach taken by this Court generally with respect to defendants' rights and entitlements in criminal cases." *Hardaway*, 317 Md. at 168, 562 A.2d at 1238. We find that our conclusion in *Hardaway* is dispositive of the issue at bar.

In the present case, Newman objected to the admission of Detective Mercer's testimony about Newman's exercise of her Fifth Amendment right to counsel, and by implication, the exercise of her Fifth Amendment right against self-incrimination. The State also failed to proffer a legitimate reason for eliciting the prejudicial testimony. Moreover, Newman objected to the use of a curative instruction to counteract the prejudice that she had suffered. As we stated in *Hardaway*, " 'It is unrealistic to assume that instructions on the right to silence always have a benign effect.' " *Hardaway*, 317 Md. at

166 n. 3, 562 A.2d at 1236–37 n. 3, quoting *Lakeside v. Oregon,* 435 U.S. at 347, 98 S.Ct. at 1098, 55 L.Ed.2d at 330 (Stevens, J., dissenting). In cases, such as the one at bar, where the testimony regarding a defendant's exercise of the right to remain silent post-*Miranda* is elicited inadvertently at best and intentionally at worst, the curative instruction is not sufficient to overcome the prejudicial inferences. Therefore, we find that a curative instruction, given over the objection of the defendant, fails to cure the prejudice caused by testimony about the post-*Miranda* exercise of the right against self-incrimination under the Fifth Amendment.[9]

### III. Conclusion

We hold that an attorney's discretionary disclosure of client communications under MRPC 1.6 does not obviate the client's ability to later successfully assert the attorney-client privilege. We also adopt the crime-fraud exception and require that the communications be made to an attorney seeking his assistance or aid in furtherance of an ongoing or future crime or fraud. Because neither disclosure under MRPC 1.6 or the crime-fraud exception destroys Newman's privilege in the present case, Friedman's testimony about his communications with Newman was inadmissible. Therefore, we reverse the decision by the Court of Special Appeals and remand the case to the Circuit Court for Montgomery County for a new trial.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND THE CASE TO THE CIRCUIT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY MONTGOMERY COUNTY.*

---

9. In any event, the curative instruction issue should not again arise because the testimony is improper and should not be elicited in subsequent proceedings.

HARRELL, J. Concurs in Part A and Result, and Dissents from Part B; WILNER, CATHELL, and RODOWSKY, JJ., Dissent.

Concurring and Dissenting Opinion by HARRELL, J.

For the reasons stated there, I join Judge Battaglia's opinion for the Court through and including its part II(A) (addressing attorney-client privilege) and, thus, the judgment; however, I also join part B (effectiveness of curative instruction regarding testimonial allusion to pre-*Miranda* silence) of Judge Wilner's dissent.

Dissenting Opinion by WILNER, J., which CATHELL and RODOWSKY, JJ., join

Since December 1999, Elsa Newman, a lawyer, had been involved in a contentious divorce action with her husband, Arlen Slobodow, that included both financial issues and custody of their two children, Lars and Herbie. The custody battle, fought in the courts of both the District of Columbia and Montgomery County, embodied claims by each party that the other had physically or sexually abused the children. On at least two occasions, Newman filed claims in the District accusing Slobodow of sexually abusing the children. One such complaint was investigated by the D.C. police and resolved as "Unfounded." The other, involving allegations of child pornography, was investigated by the FBI; it too was closed without action. In early 2001, following an apparent finding by the District of Columbia court that *Newman* had abused or neglected the children, Slobodow was given custody of the children and Newman was limited to supervised visits. That arrangement was confirmed by the Circuit Court for Montgomery County in September, 2001. Trial with respect to "permanent" custody was scheduled for January 28, 2002 in Montgomery County.

Newman apparently decided not to wait, or to trust her luck to the judicial process. Instead, she arranged for her longtime girlfriend, Margery Landry, to break into Slobodow's home during the dead of night, kill him, and leave behind

packets of pornographic material as evidence that he had been sexually abusing his two sons. The fact that the children were also in the home and might be hurt or killed as well did not seem to matter. Landry, indeed, attempted to carry out that plan and nearly succeeded in doing so. At some point in the early morning hours of January 7, 2002, while Newman was conveniently in New Jersey, Landry, dressed in black and wearing a ski mask and latex gloves, broke into Slobodow's home, assaulted Slobodow as he lay in bed, shot at him twice, wounding him once in the leg, beat him over the head with a telephone, and attempted to flee. When Slobodow attempted to reach another telephone to call for help, she assaulted him a second time and succeeded in escaping through a window, leaving behind a handgun with an obliterated serial number, an empty clip and two spent shell casings, a fanny pack containing a box of nine millimeter ammunition, a pornographic video tape, and pornographic magazines and books. Landry was arrested, charged with and pled guilty to assault, burglary, reckless endangerment, use of a handgun in the commission of a felony, and obliterating the serial number on a handgun, and sentenced to prison for 53 years, with all but 20 years suspended.

In the belief that Landry's conduct was part of a conspiracy to affect the outcome of the pending custody case, the State charged Newman with conspiracy, attempted first degree murder, assault, burglary, and unlawful use of a handgun. On more than ample evidence, she was convicted on all counts and sentenced to life in prison, with all but 20 years suspended.

The Court proposes to reverse those convictions and award Newman a new trial because it concludes that (1) certain threatening admissions made by Newman in the presence of her domestic relations attorney were inadmissible, and (2) a relatively innocuous statement by a detective that was immediately dealt with by a fully adequate curative instruction was so prejudicial as to be beyond remedy other than by declaring a mistrial. Both of those conclusions, in my view, are wrong, and I therefore respectfully dissent.

## A.

### *The Attorney's Testimony*

The State presented several categories of evidence against Newman. One concerned the events of January 7 at Slobodow's home; a second dealt with the close relationship between Newman and Landry. The category at issue here involved statements made by Newman to various people during the divorce and custody litigation, some of which were recounted at trial by Newman's divorce lawyer, Stephen Friedman. In examining the issues raised by Newman regarding that testimony, some greater context than appears in the Court's opinion is necessary.

Newman first employed Friedman in December, 1999, to represent her in her divorce case, which, as noted, came to include collateral abuse and neglect charges in both Maryland and the District of Columbia. In August, 2000, about three weeks before scheduled trial in the custody aspect of the divorce case, Newman fired Friedman. In January, 2001, she fired the lawyer she had retained to replace him and re-employed Mr. Friedman. During the first period of representation, Newman became friendly with Friedman's secretary, Sandra Ashley. In December, 2000—after she had fired Friedman and before she rehired him—Newman called Ms. Ashley and arranged to have dinner with her. During that dinner, she informed Ms. Ashley that she "had plans to murder her husband." Specifically, she said that her friend Landry "had connections with the mob in Chicago," that Landry was trying to obtain a gun from Chicago that was untraceable, and that she planned to dress all in black. She said at the time that she intended to catch her husband on the street in Washington when the children were not with him and kill him. Ashley said that Newman seemed quite serious, even when warned about the consequences, and that Ashley took the threat seriously. After consulting with an attorney, however, Ms. Ashley decided not to report the matter to the authorities, but, in February, 2001, after Newman had rehired

Friedman, she advised Friedman of the conversation in an e-mail.

Friedman received another e-mail in February regarding the same kind of threat, this one from his associate, Beth Rogers. Ms. Rogers had accompanied Newman to an FBI polygraph test, presumably in connection with her complaint that Slobodow was involved in child pornography. When Newman "failed" the test, Rogers reported that she said several times that "she would kill herself and the kids."

At some point, possibly in April, 2001, Newman and Landry were in Friedman's office. Newman often brought Landry to meetings with Friedman. Newman was upset because the District of Columbia court had recently given custody of the children to Slobodow. As Friedman was busy reading a report of some kind, Newman and Landry were conversing with one another. They were not talking to Friedman, and he was not part of the conversation. Newman was talking to Landry about shooting Lars and framing Slobodow. They spoke about the need to do the deed personally and not to hire someone, to have an alibi, and to plant pornographic evidence in Slobodow's house so he would be blamed. Friedman said that he was trying not to listen to the conversation and asked them to stop. He said that he did not take the conversation seriously at that point. That kind of conversation later occurred on another occasion, whereupon Friedman barred Landry from participating in his meetings with Newman.

On August 31, 2001, Friedman met with Newman for several hours to prepare for a hearing set before Judge Ryan on September 4. The hearing was to be on some of the financial aspects of the divorce. Although, according to him, Newman was "in a rage" during the early part of the meeting, at some point she got quiet and thoughtful, and announced "You know, I don't have to kill both children. I only need to kill Lars because I can save Herbie, and then Arlen will go to jail and get what he deserves because he is a criminal, and I can at least save Herbie." Friedman said that comments such as that had been made before, and he cautioned her that she

could not involve him in a murder and that he had an obligation to tell the court when she "[said] stuff like that." Newman responded that he was not allowed to repeat any of it and she would sue him if he did so.

Friedman said that he was now concerned that Newman or Landry would kill either Lars or Slobodow, and that, after consulting an ethics adviser and a psychologist, he concluded that he might be an accessory before the fact to murder. Not desiring to contact the authorities or Judge Ryan, he instead, on the morning of the hearing, came to court early and consulted Judge Weinstein, the county administrative judge, who referred him to Judge Scrivener, the judge who headed the Family Division. Invoking Maryland Rule of Professional Conduct 1.6, Friedman recounted his concerns to her, including Newman's threat to kill Lars and blame Slobodow. He read to her the e-mail he had received from Ms. Rogers. Judge Scrivener said that she would deal with the matter, following which Friedman reported to Judge Ryan's courtroom, prepared to participate in the hearing. After discussing the matter with several of her colleagues, Judge Scrivener called Judge Ryan, in the middle of the hearing, and informed him of what Friedman had disclosed. Judge Ryan returned to court and, on the record, recounted what Judge Scrivener had told him, namely, that "Ms. Newman has told Mr. Friedman and others that if she does not obtain custody of the children that she would kill the children rather than expose them to the torture of Mr. Slobodow . . . and that she had hired a hitman to kill him, that is, to kill Mr. Slobodow." Judge Ryan concluded that Mr. Friedman was obliged to make that disclosure and permitted him to withdraw his appearance.

In a preliminary proceeding before Judge Rupp, prior to the commencement of her criminal trial, Newman objected to Friedman's testifying, claiming that her disclosures to him were privileged. The prosecutor responded that, although Friedman was then in court, he had not spoken with the prosecutors regarding Newman's statements, that the State had no intention of calling him as a witness, and that it desired only to put into evidence the transcript of the proceeding

before Judge Ryan, which was a public record. Nonetheless, Friedman was called to testify at the preliminary proceeding with respect to the circumstances behind his disclosure to Judge Scrivener, so the court could rule on whether those disclosures, as revealed in the transcript of the proceeding before Judge Ryan, were protected by the privilege. After listening to that testimony, as recounted above, Judge Rupp, consistently with the rulings of Judges Ryan and Scrivener, concluded that Friedman had acted reasonably and that "he did what he needed to do under [R]ule 1.6."

The relevant part of the transcript of proceedings before Judge Ryan on September 4 was placed into evidence as a Joint Exhibit, by stipulation. The prosecutor was concerned, however, that the transcript revealed, in substance, only what Judge Ryan said that Judge Scrivener had told him about what Friedman had told her regarding statements made by Newman, which was effectively quadruple-level hearsay. She changed her view and indicated her desire to speak directly with Friedman and to call him as a witness. Friedman declined to speak with the prosecutor or to testify unless specifically ordered to do so. Judge Rupp, following his earlier ruling that the disclosure to Judge Scrivener was appropriate, entered an order to the effect that (1) Friedman was not precluded from disclosing to the prosecutor what he had disclosed to Judge Scrivener, and (2) Friedman, having been subpoenaed to testify, was required to do so. In accordance with that order, Friedman testified at trial and disclosed to the jury essentially what he had previously told Judge Scrivener.

The Court recognizes that there are two legal precepts that need to be considered. The one actually invoked by Friedman is Maryland Rule of Professional Conduct 1.6. Section (a) of that Rule effectively precludes a lawyer from revealing information relating to representation of a client unless authorized by the client or by section (b) of the Rule. In relevant part, § (b) authorizes a lawyer to reveal information to the extent that the lawyer reasonably believes necessary "(1) to prevent the client from committing a criminal or fraudulent act that

the lawyer believes is likely to result in death or substantial bodily harm." The other precept is the ancient common law attorney-client privilege that has been codified by reference in Maryland Code, § 9–108 of the Cts. & Jud. Proc. Article ("A person may not be compelled to testify in violation of the attorney-client privilege.").

The Court recognizes that there is "a subtle relationship between the confidentiality required under Rule 1.6 and the evidentiary rule of the attorney-client privilege" in that "[t]he principle of confidentiality is given effect in both bodies of law." The Court does not seem to take issue with the validity of Friedman's disclosures to Judge Scrivener under Rule 1.6 and thus, I assume, accepts Judge Scrivener's, Judge Ryan's, and Judge Rupp's determinations that Friedman acted properly under the Rule in making the disclosure to Judge Scrivener. The Court thereby presumably accepts that Friedman reasonably believed that the disclosure was necessary to prevent Newman, or Landry from committing a criminal act likely to result in death or substantial bodily harm to another. Indeed, events showed rather remarkably the reasonableness of that belief.

The Court then detaches the evidentiary privilege from the Rule and, relying principally on *Purcell v. District Attorney for the Suffolk District*, 424 Mass. 109, 676 N.E.2d 436 (1997), concludes that, even if disclosure is appropriate under the Rule, the attorney may be prevented from making the same disclosure in court. Although I recognize that the Rule and the evidentiary privilege are not identical in scope (*see Parler & Wobber v. Miles & Stockbridge*, 359 Md. 671, 688–93, 756 A.2d 526, 535–38 (2000)), but, with all due respect to the Supreme Judicial Court of Massachusetts, I can discern no justification whatever for a holding that an attorney may, under Rule 1.6, properly disclose client communications, clearly intended to be confidential, to law enforcement or judicial authorities that almost certainly will result in a criminal investigation of the client and may well result in criminal charges being filed against the client, but that, if such charges

are brought, the attorney may be precluded from making the self-same disclosures in court.

Borrowing in part from the Massachusetts case, the Court offers three reasons for such a distinction: (1) lawyers will be reluctant to make disclosures "if they know that the information they disclose may lead to adverse consequences to their clients," (2) permitting such disclosures in court "could chill the free discourse between the lawyer and the client, thereby limiting the lawyer's ability to thwart threats in the future," and (3) to allow the attorney to testify in court would, in effect, permit the attorney to waive the privilege that belongs to the client. None of those reasons can survive any critical analysis; indeed, at least the first two really make little sense.

I cannot conceive, and the Court offers no explanation, of why a lawyer who believes that a disclosure is necessary to prevent death or serious bodily harm to another will feel free to make a disclosure under Rule 1.6, knowing that, as a result, his client will almost certainly be the target of a criminal investigation, but will nonetheless be reluctant to make the disclosure because he/she may be called to testify in court. If there is any empirical evidence that lawyers have withheld disclosures that are permitted and otherwise would be made under Rule 1.6 because of a fear that their client may be harmed if they ultimately are called to testify, the Court has not cited it. I expect that the Court has not cited such evidence because it does not exist. Similarly, the Court has cited no evidence, because I expect it does not exist, that "free discourse between the lawyer and the client" will somehow be chilled if the lawyer, who may properly "spill the beans" to law enforcement authorities under the Rule, is also free to testify in court.

The third reason offered is equally baseless. The evidentiary privilege always remains with the client, but the privilege is not absolute and has never been regarded as absolute. There are exceptions to it, and when those exceptions apply, the client's privilege is either lost or diminished.

The only issue in this regard is whether the "crime/fraud" exception embodied in Rule 1.6 should be recognized as well under the evidentiary privilege, and I can see no reason why it should not be. The exception for disclosures relating to threats of death or serious bodily injury is based on supervening public policy—the determination by the American Bar Association, which initially drafted and approved Rule 1.6, and by the State Supreme Courts, including this Court, that have also approved and actually promulgated the Rule that the general rule of confidentiality needs to bend in that circumstance. That public policy has equal force with respect to the testimonial privilege. Yes, it can be terribly disadvantageous to a client to have his/her lawyer disclose in court, or before some other tribunal, that the client threatened to kill or seriously injure a particular victim and that the threat was credible, but that is no more disadvantageous than permitting the lawyer to disclose that information to law enforcement authorities with a view toward commencing and pursuing a criminal investigation against the client. Drawing the distinction that the Court proposes to draw simply muddles the law, gives no clear guidance to lawyers in a most difficult area that cries out for consistency, and achieves no counterbalancing useful objective.

Apart from that, the Court fails to give appropriate consideration to just what was presented to the jury. Ms. Ashley's testimony was clearly not protected by any attorney-client privilege. Friedman's testimony regarding the conversation between Newman and Landry that occurred in April, 2001 also, in my view, was not protected by the testimonial privilege, and, indeed, the Court's conclusion to the contrary is inconsistent with its own definition of the privilege. Friedman was not testifying as to communications made by Newman to *him,* but as to a conversation between Newman and Landry that he simply overheard. The Court defines the testimonial privilege as a rule that "prevents the disclosure of a confidential communication made by a client *to his attorney for the purpose of obtaining legal advice."* (Emphasis added). The

Court either overlooks or ignores the fact that the communications made at that April, 2001 meeting were not of that kind.

The Court's opinion, I am sorry to say, is flawed both legally and factually and espouses a view that makes little sense.

## B.

### *Post–Miranda Silence*

On August 1, 2002, the fourth day of trial, the State called Detective Susan Mercer to testify. Detective Mercer responded to the Slobodow home following the report of a shooting and was the lead investigator in the case. She testified first about the arrest of Landry and the various injuries noted on Landry's hand and finger. She then was asked about her first contact with Newman, upon her arrest on January 10. This was the relevant colloquy:

Q And did you have any conversation with Ms. Newman?

A Yes.

Q Okay. Did you advise her of her rights?

A Yes, sir.

Q And what rights did you advise her of?

A That she had the right to remain silent, she had the right to an attorney. At which time she advised that she would like to consult with an attorney. Actually, she had an attorney waiting in the station lobby for her.

Newman immediately moved for a mistrial based on the Detective's volunteered statement regarding Newman's decision to consult an attorney. The court recognized the error but concluded that a mistrial was not necessary and instead gave the following curative instruction:

"You have heard testimony that Elsa Newman was accompanied by an attorney when she appeared at the police station on January 10, 2002.

This is not evidence to be considered by you. Ms. Newman is presumed to be innocent of the charges against her. You have heard evidence that Ms. Newman's x-husband, Arlen Slobodow was shot on January 7, 2002.

Ms. Newman's house was searched following the shooting. She was aware of this on January 10, 2002. It is fully consistent with the presumption of innocence that anyone under these circumstances would appear and consult with an attorney at the police station to protect his or her interests."

We have always accorded trial judges wide discretion in ruling on motions for mistrial. They are in the best position to determine whether an error, especially an evidentiary error, is so dramatically prejudicial as to require a mistrial—to be beyond remedy by a curative instruction. Only in the rarest instances have we second-guessed a trial judge's determination in that regard. Citing cases that are wholly inapposite, the Court holds, as a matter of law, that the brief, unsolicited remark by Detective Mercer is of that character. To me, that is utter nonsense. Yes, it was error. That is not the point. The point, rather, is that this brief, unsolicited remark was immediately corrected by a clear and responsive curative instruction, that it occurred on the fourth day of trial, and that the overall evidence against Newman was more than abundant, if not, in fact, overwhelming. There is simply no rational basis for concluding that Detective Mercer's remark so thoroughly and uncorrectably tainted the trial that a mistrial was required as a matter of law. We have allowed far more grievous errors to be corrected by curative instructions. But for Judge Harrell's concurrence in this part of the dissent, which deprives the Court's opinion on this issue of any precedential value, its purported ruling would sow nothing but confusion; it could not be cabined to just remarks about post-*Miranda* silence. Every error that creeps into a trial would become the subject of a motion for mistrial, and trial judges would be acting at their peril if they did not grant the motion.

For these reasons, I would affirm the judgment of the Circuit Court.

Judge CATHELL and Judge RODOWSKY authorize me to state that they join in this dissent.